No. 100,005

STATE OF KANSAS, *Appellee,* v. SANFORD COLSTON, *Appellant.*
(235 P.3d 1234)

Opinion filed July 23, 2010.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, argued the cause, and *Carl Folsom, III*, of the same office, was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

MALONE, J.: Sanford Colston appeals his convictions of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child. Colston claims: (1) The trial court erred when it failed to give a unanimity instruction even though the State presented evidence of multiple acts supporting each count; (2) his conviction of aggravated indecent liberties with a child should be vacated because it is a lesser included offense of rape when both offenses are charged under K.S.A. 21-4643; (3) his convictions should be reversed because the trial court failed to instruct the jury to determine his age as an essential element of each offense; (4) the trial court committed reversible error when it gave an *Allen*-type instruction to the jury before deliberations began; and (5) the combination of errors deprived Colston of his right to a fair trial. We have jurisdiction under K.S.A. 22-3601(b)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

B.N. was 12 years old in the summer of 2006 when her mother, Donna, began dating Colston. Although Donna and B.N. had lived

together in Topeka for most of B.N.'s life, that summer they moved to Wyandotte County to live with Colston and his parents, Dick and Betty Colston. Colston, Donna, and B.N. stayed in the unfinished basement of the single family home. The home did not have air-conditioning and when it started to get hot in August, the three of them often spent the night at the air-conditioned apartment of Colston's adult daughter, April. B.N. kept her dog Cocoa at Dick and Betty's home, and she would check on Cocoa almost every day.

On Friday, August 11, Colston, Donna, and B.N. spent the day swimming at an apartment complex pool. That evening between 8 and 9 p.m., Colston took B.N. to his parents' house to check on Cocoa. Dick, who had a heart condition and was on oxygen, was in his bedroom, and Betty was watching television in the living room. Colston's adult son, Michael, was also there. Michael had been drinking and wanted Colston to drive him to his place of employment where he worked the night shift. While Michael was on the phone with his boss, Colston and B.N. went downstairs to the basement to check on Cocoa. After approximately 45 minutes, Michael went to the basement door and yelled downstairs that he needed Colston to take him to work immediately. When he did not receive an answer, Michael started down the stairs. Colston yelled at him not to come down, but Michael came down some of the steps and looked around the corner. He saw Colston on top of B.N. on the bed and both of them were naked. Startled, Michael turned around and went upstairs. Colston and B.N. got dressed, came upstairs, and drove Michael back to April's apartment and then to work.

While Michael was at work on the night of August 11, he told his coworker about what he had seen between B.N. and Colston. Michael also told his ex-wife and his cousin about the incident. Michael did not call the police that night, but he believed that eventually someone reported the incident to the Kansas Department of Social & Rehabilitation Services (SRS).

On Monday, August 14, Colston told Donna that it was "being said" that he had committed a sex crime against B.N. Donna and Colston confronted B.N. about the allegation, and she denied that Colston had touched her. Colston and Donna decided to take B.N.

to the University of Kansas Medical Center (KU Medical Center) to determine whether she had been raped.

At KU Medical Center, Donna informed the emergency room nurse, Jeanine McCullough, that they were there to prove B.N. had not been molested. McCullough performed a physical examination and checked B.N. for bruising, scratching, and bite marks. She also did a visual examination of B.N.'s vagina and a blind swab with a Q-tip. McCullough called KU Medical Center social worker Tiffany Moore to assist her. During the course of the examination, McCullough and Moore asked B.N. questions and B.N. looked to Donna before replying. Donna refused to allow B.N. to answer many of the questions. McCullough did not see any marks and considered the physical examination normal.

At one point during the examination, Donna and Colston went outside to smoke. While B.N. was alone with McCullough and Moore, B.N. told them she had been molested by a man in the basement apartment where they lived. B.N. did not want to identify the man or describe what had happened. B.N. told McCullough and Moore that when the "red-hair guy" saw them in bed, the man who was molesting her said "don't come down here," and the red-hair guy went back upstairs. When Donna returned from the smoke break without Colston, B.N. repeated the same story.

Moore contacted the Kansas City Police Department. Upon questioning by Officer Nicholas Kohrs, B.N. stated she had been molested by her "mother's boyfriend." Kohrs did not conduct an extensive interview with B.N., but she informed him that her mother's boyfriend had removed her clothes and inserted his penis into her vagina. Later, when Kohrs' sergeant joined the interview, B.N. identified Colston as the man who molested her. After the interview, B.N. was placed into SRS's temporary custody.

Three days later on August 17, 2006, Sarah Byall, a child interview specialist at Sunflower House, conducted a videotaped interview of B.N. B.N. told Byall that while she was downstairs in the basement of Dick and Betty's house on Friday night checking on Cocoa, Colston asked her to make love to him. She told him no, but he told her to undress. When she did not, he laid her on her mother's bed and took off her shorts and swimsuit. B.N. started

crying. At first, Colston told B.N. he was not going to do anything, but then he pulled her legs apart and put his penis in her vagina. B.N. said that Colston kept his penis in her for 2 to 5 minutes and she tried to push him away because it hurt. Colston tried to make B.N. roll over and get on her hands and knees, but she could not do it because she was crying too hard. When Michael came down the stairs, Colston stopped.

B.N. told Byall that on the next day, Saturday, Colston took her back to the house to check on Cocoa again. She was still wearing the same swimsuit and shorts. After taking Cocoa out, B.N. sat on her bed. Colston approached her and said he wanted to make love to her again like the first time. She said no but he took off her clothes and started rubbing her right breast. Colston stated he wanted to taste her, and he licked her breast and then her vagina. B.N. stated that she "peed" on the bed. Colston then told B.N. it would not take as long this time, and he put his "private part" in her body. B.N. stated that the whole encounter lasted about 4 minutes.

Stephanie Strout, a physician assistant at Sunflower House, performed a medical examination of B.N. B.N. reported to Strout that there was blood in her swimsuit following the first incident.

On August 18, 2006, the State charged Colston with one count of rape occurring on or about August 11, 2006, in violation of K.S.A. 21-3502; one count of rape occurring on or about August 12, 2006, in violation of K.S.A. 21-3502; one count of aggravated criminal sodomy occurring on or about August 12, 2006, in violation of K.S.A. 21-3506; and one count of aggravated indecent liberties with a child occurring on or about August 12, 2006, in violation of K.S.A. 21-3504. Each count was identified in the charging document as an off-grid person felony.

*Trial evidence*

The district court held a trial on the charges commencing May 14, 2007. At trial, Donna, Michael, McCullough, Moore, Kohrs, Byall, and Strout testified consistently with the facts set out above. The jury watched the videotaped interview of B.N. at Sunflower House. In addition, the State presented forensic evidence of blood

in the crotch area of B.N.'s swimsuit and evidence of Colston's DNA in both the crotch area of B.N.'s swimsuit and on B.N.'s cheetah print bed sheet.

For the most part, B.N.'s trial testimony was consistent with her statements at Sunflower House. At trial, B.N. testified that on Friday, August 11, 2006, she had been swimming and then went to April's house to play video games. While at the swimming pool, B.N. would sit on her mother's lap in the water, but when her mother would get up to smoke a cigarette she would move B.N. to Colston's lap. B.N. testified that Colston would put her between his legs, which made her feel uncomfortable, so she would move back onto his knee. That evening, Colston suggested he and B.N. go check on Cocoa. B.N. asked her mother to accompany them, but she declined.

When Colston and B.N. arrived at Dick and Betty's house, B.N. greeted them and then went downstairs to let Cocoa out. After Cocoa came back downstairs, B.N. praised Cocoa on her mother's bed. Colston, who was sitting on the couch in the basement, told B.N. he wanted to make love to her. B.N. stated she wanted to go upstairs but Colston told her no. Colston then reminded B.N. that she had said she would do anything to keep him from getting mad and that she had been making him mad lately. Colston told B.N. she had to lie down on the bed. He told her to take off her swimsuit and shorts. When she did not, he removed them. Colston then took off his shorts. B.N. testified that Colston put "his private" inside of her and that it hurt. Colston positioned himself behind B.N. and told B.N. to get on her hands and knees, but she could not because she was too shaky from crying.

B.N. also testified that Colston licked her privates and it hurt because he had not shaved. She also stated that Colston stuck his finger in her privates and touched her breast, but she provided no details of these acts or the sequence in which they occurred. B.N. testified that the whole incident lasted about 10 minutes, and it ended when Michael came down the stairs and Colston told him to go back up. Colston told B.N. to get dressed and not to tell anybody because if she did he would do something he did not want to do. B.N. did not tell anyone what had happened because she

was afraid that Colston would hurt her mother. When she returned to April's apartment, B.N. used the restroom where she noticed little red blood dots in her swimsuit.

The next day, B.N. again went swimming, wearing the same swimsuit and shorts. Later, she asked her mother to go with her to take care of Cocoa, but she again declined, telling B.N. that she could go with Colston and it would not take very long. Like the previous day, when B.N. arrived at Dick and Betty's house, she went downstairs to let Cocoa outside. When Cocoa returned to the basement, B.N. made a point of sitting on her own bed to praise Cocoa, not her mother's bed. Colston approached B.N., telling her that he was sorry for what he had done the day before but that he wanted to do it one more time and then he would never do it again. B.N. told him he had already promised he would never do it again, and he responded by telling her that promises can be broken. Colston told B.N. to take off her clothes. She was too shaky to comply, so Colston removed her swimsuit and shorts. B.N. testified that Colston "stuck his private" in her "lower private." B.N. then asked if she could leave to use the restroom, and Colston told her "no, just go pee on [the] bed." While B.N. urinated, Colston held his finger in her vagina. Colston then told B.N. to get dressed and not to tell anybody what had happened. He told B.N. there would be no evidence of what had happened because she had not started having her periods.

Colston called his mother to testify. Betty Colston testified that on Friday, August 11, Michael had been at her house and he had been intoxicated. She remembered that Colston and B.N. had come over but she never saw Colston and B.N. go downstairs. She testified that they did not come over the next day at all. Donna had testified for the State and she also stated that no one took care of Cocoa on Saturday.

Colston testified in his own defense. He testified that on Friday, while they were swimming, B.N. put her feet on his knees so he could throw her, but she did not sit in his lap. He testified that later in the evening, he and B.N. went to his parents' house where Michael was very drunk. Colston testified that he took Cocoa outside, and when he came back in, B.N. was in her room and Michael

was coming down the steps to the basement. Colston told Michael not to come down because B.N. was changing her clothes. Michael started to come down anyway and Colston told him to go back up. Then Colston also went upstairs and B.N. came up shortly afterwards. Colston denied going back to the house to take care of the dog on Saturday. He testified that they went back to the house on Sunday, but it was so hot they returned to April's apartment that night to sleep.

During the trial, Donna testified that she was 31 years old and that Colston was almost 20 years older than she. Michael testified that he was 29 years old at the time of trial and his sister April was 31 years old and that Colston was their father.

At the close of the evidence, the district court instructed the jury that Count I of rape allegedly occurred on or about August 11, 2006; Count II of rape allegedly occurred on or about August 12, 2006; Count III of aggravated criminal sodomy allegedly occurred on or about August 11, 2006; and Count IV of aggravated indecent liberties with a child allegedly occurred on or about August 12, 2006. The district court also gave the jury an *Allen*-type instruction. Colston did not object to any of the jury instructions, and he did not request any additional instructions.

During closing arguments, the State acknowledged that B.N. stated at Sunflower House that the oral sex had occurred on the second day, but in court she stated that it occurred on the first day. The State emphasized that with that exception, all the core details, including the fact that the oral sex occurred only one time, remained consistent.

The jury submitted a question during deliberations: "What does 'on or about' mean with regard to the date a[n] act occurred on Count 4? Can it be applied to the previous date?" The district court responded that with respect to Count IV, "on or about" could refer to either August 11 or 12, but the jury must be unanimous as to the date the offense occurred.

The jury found Colston guilty of rape as charged in Count I, aggravated criminal sodomy as charged in Count III, and aggravated indecent liberties with a child as charged in Court IV. The jury acquitted Colston of rape as charged in Count II. The pre-

sentence investigation report disclosed prior convictions of aggravated robbery, kidnapping, and two counts of rape. The trial court sentenced Colston to three concurrent life sentences without the possibility of parole for 40 years pursuant to K.S.A. 21-4643(b)(1) (Jessica's Law). Colston timely appealed.

## MULTIPLE ACTS—UNANIMITY INSTRUCTION

Colston first claims that his convictions of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child involved multiple acts which could have sustained each conviction. Because the district court failed to give the jury a unanimity instruction, Colston argues that all three convictions must be reversed.

Under Kansas law, a jury verdict in a criminal trial must be unanimous. K.S.A. 22-3421. Normally this requirement is satisfied if the trial court instructs the jury that its verdict must be unanimous on each separate count. However, achieving unanimity can be complicated when the State charges a defendant with a single count based on multiple acts. In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). The multiple acts situation is especially common in sex offense cases. In order to ensure jury unanimity as to the specific act for which the defendant is charged, the trial court must either require the State to elect the particular criminal act upon which it will rely for the conviction or instruct the jury that all jurors must agree that the same underlying criminal act has been proven beyond a reasonable doubt. *State v. Voyles*, 284 Kan. 239, Syl. ¶ 2, 160 P.3d 794 (2007).

In *Voyles*, this court set out a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine if the case truly involves multiple acts, *i.e.*, whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred, *i.e.*, whether there was a failure by the State to elect an act or a failure by the trial court to instruct. Third, the court must determine whether the error is re-

versible. 284 Kan. at 252-53. We will apply these steps to Colston's case.

*Step 1—Is This A Multiple Acts Case?*

The threshold question in a multiple acts analysis is whether the defendant's conduct is part of one act or represents multiple acts which are separate and distinct from each other. There is no single test for whether conduct constitutes one act or separate and distinct multiple acts. Rather, the courts must look to the facts and the theory of the crime as argued to determine whether a jury verdict implicates unanimity issues. *State v. Allen,* 290 Kan. 540, Syl. ¶¶ 1, 2, 232 P.3d 861 (2010). Whether a case is a multiple acts case is a question of law over which this court has unlimited review. *Voyles,* 284 Kan. 239, Syl. ¶ 1.

This court has determined that acts are multiple acts if they are factually separate and distinct. Further, " '[i]ncidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by a "fresh impulse." ' " *State v. Kesselring,* 279 Kan. 671, 683, 112 P.3d 175 (2005) (quoting *State v. Hill,* 271 Kan. 929, 939, 26 P.3d 1267 [2001]). In addition, this court has identified other factors for determining if there is unitary conduct in a multiple acts case. These factors include: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *State v. Schoonover,* 281 Kan. 453, 507, 133 P.3d 48 (2006). We will apply this analysis to determine whether any of Colston's convictions involved multiple acts.

*Count I—Rape*

Under K.S.A. 21-3502(a)(2), rape is "sexual intercourse with a child who is under 14 years of age." K.S.A. 21-3501(1) defines "[s]exual intercourse" as "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse."

Colston argues that the State presented evidence of multiple acts that would support the rape alleged in Count I. Colston identifies four possible acts: (1) B.N. testified that Colston put his penis in her vagina on Friday, August 11; (2) B.N. testified that Colston put his finger in her vagina on Friday, August 11; (3) B.N. testified that Colston put his penis in her vagina on Saturday, August 12; and (4) B.N. testified Colston put his finger inside her vagina as she urinated on her bed on Saturday, August 12.

The State argues that Colston was charged in Count I with rape on August 11 and in Count II with rape on August 12. Because Colston was acquitted of the rape in Count II, the State argues that the alleged acts on August 12 could not possibly be considered as multiple acts supporting the conviction in Count I. This would be the case if the exact date for Count I was August 11 and the exact date for Count II was August 12. However, Colston was charged in Count I with rape occurring *on or about* August 11 and the jury was so instructed. As Colston points out, the jury could have still considered alleged acts that occurred on August 12 in order to support the rape conviction in Count I.

Generally, the exact date that an offense was allegedly committed is not an element of the crime. This court has held where a defendant is not misled or prejudiced in making his or her defense by the allegation of when the crime occurred, a conviction may properly follow upon sufficient proof that the crime was committed at any time within the period of the statute of limitations. *State v. Armstrong*, 238 Kan. 559, 561, 712 P.2d 1258 (1986); *State v. Jones*, 204 Kan. 719, 725, 466 P.2d 283 (1970). We are aware that the jury instruction on rape recommended by Pattern Instructions for Kansas contains language in the venue element that "this act occurred on or about" a specific date in a specific county. PIK Crim. 3d 57.01. Usually the "on or about" language in the charging document and the jury instruction is not problematic. *Jones*, 204 Kan. 719, Syl. ¶ 4. However, in a case such as this one where the alleged rapes occurred on two consecutive dates, the "on or about" language invites a multiple acts problem.

Here, the State presented evidence of up to four separate acts of sexual intercourse occurring over two consecutive days. The ev-

idence consisted of B.N.'s trial testimony as well as her videotaped statement. Because of the "on or about" language contained in the jury instructions, the jury could have considered the alleged acts that occurred on August 12 in order to support the rape conviction in Count I. In this instance, the trial court could have avoided confusion by instructing the jury that the rape charge in Count I allegedly occurred only on August 11 and the rape charge in Count II allegedly occurred only on August 12. Presumably the jury's verdict in Count I was based only on the August 11 behavior, but as an appellate court reviewing the record we cannot be absolutely sure.

We agree with Colston that based on the way Count I was charged and instructed, the jury's verdict could have been supported by the following multiple acts: (1) B.N.'s testimony that Colston put his penis inside her vagina on August 11; (2) B.N.'s testimony that Colston put his penis inside her vagina on August 12; and (3) B.N.'s testimony that Colston put his finger inside her vagina on August 12. Based on the record, the digital penetration on August 11 did not appear to be a factually separate and distinct act from the penile penetration on that same date. The acts occurred at or near the same time and location without an intervening event between them. However, we find under the specific facts of this case that the digital penetration on August 12 was a factually separate and distinct act from the penile penetration on that same date. Colston had completed the act of penile penetration and the digital penetration appeared to be motivated by a fresh impulse when B.N. asked Colston if she could leave the room to urinate. See, *e.g.*, *State v. Zamora*, 247 Kan. 684, 693-94, 803 P.2d 568 (1990) (digital penetration followed about 2 minutes later with penile penetration supported two separate counts of rape). Therefore, the rape conviction in Count I involved multiple acts.

*Count III—Aggravated Criminal Sodomy*

Colston argues that, based on evidence presented at trial, his conviction of aggravated criminal sodomy could have been based on two separate acts. B.N. testified at trial that Colston licked her vagina on Friday, August 11, and she made a videotaped statement

at Sunflower House, which was presented to the jury, that Colston licked her vagina on Saturday, August 12. The State argues that B.N. never alleged the sodomy occurred more than once. At trial, she simply changed the date the sodomy occurred from Saturday to Friday, and she never testified that a second oral sexual encounter occurred on Saturday.

Aggravated criminal sodomy is "[s]odomy with a child who is under 14 years of age." K.S.A. 21-3506. K.S.A. 21-3501(2) defines "[s]odomy" as "oral contact or oral penetration of the female genitalia."

The jury was instructed that Count III, aggravated criminal sodomy, allegedly occurred on or about August 11, 2006. However, on this charge the "on or about" language in the jury instruction is not problematic. Based on a thorough review of the record, it does not appear that B.N. alleged a second act of sodomy at any time, nor is there evidence of a second instance that could be construed as sodomy under the statutory definition. Both the videotape of B.N.'s statement at Sunflower House and her testimony at trial described only one act of sodomy. The jury's agreement on the specific date the act occurred was unnecessary. As such, regarding Count III, there is no multiple acts issue, and Colston's argument fails to survive the threshold question under the *Voyles* analysis.

### Count IV—Aggravated Indecent Liberties

Colston argues that the State presented evidence at trial of multiple acts that would constitute aggravated indecent liberties with a child. This evidence includes: (1) the sexual intercourse (by penetration with Colston's penis or finger), (2) the oral sex, (3) Colston putting B.N. between his legs while they were at the pool, (4) Colston removing B.N.'s clothes prior to sexual intercourse, and (5) Colston fondling B.N.'s breast. The State argues that it relied on only one act to support the charge of aggravated indecent liberties with a child—the touching and licking of B.N.'s breast.

K.S.A. 21-3504(a)(3) defines "[a]ggravated indecent liberties with a child" as "engaging in any of the following acts with a child who is under 14 years of age: (A) any lewd fondling or touching of

the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." See *State v. Wells*, 233 Kan. 94, 98, 573 P.2d 580 (1977). The trial court defined lewd fondling and touching in jury Instruction No. 11 for Count IV regarding aggravated indecent liberties with a child as follows:

"[T]he term 'lewd fondling or touching' means a fondling or touching in a manner which tends to undermine the morals of the victim, which is so clearly offensive as to outrage the moral senses of a reasonable person, and which is done with the specific intent to arouse or satisfy the sexual desires of either the victim or the offender or both. Lewd fondling or touching does not require contact with the sex organ of one or the other."

Colston first argues that evidence of the acts of sexual intercourse or oral sex constituted multiple acts that could have supported the conviction of aggravated indecent liberties with a child. Under the strict statutory definition of the terms, the acts of sexual intercourse and oral sex *could* support a conviction of aggravated indecent liberties with a child because these acts constitute lewd fondling or touching. Had Colston been charged only with aggravated indecent liberties with a child, the evidence of the acts of sexual intercourse and oral sex would have created a multiple acts situation requiring jury unanimity of the underlying criminal act.

But Colston was charged with separate counts of rape and aggravated criminal sodomy in addition to the aggravated indecent liberties charge. A multiple acts situation occurs only when the State presents evidence of two or more acts that could support a *single count*. Based on the theory of the crimes as argued by the State, the evidence of sexual intercourse supported the rape charges against Colston, and the evidence of oral sex supported the aggravated criminal sodomy charge. The jury was instructed on the definition of "sexual intercourse" in connection with the rape charges and the definition of "sodomy" in connection with the aggravated criminal sodomy charge. Also, the jury was instructed that aggravated indecent liberties with a child required Colston's specific intent to arouse or to satisfy the sexual desires of either Colston or B.N. or both. The rape and aggravated criminal sodomy charges did not include this element.

As we have stated, there is no single test for determining whether conduct constitutes multiple acts and courts must look to the facts and the theory of the crime as argued to determine whether a jury verdict implicates unanimity issues. *Allen*, 290 Kan. 540, Syl. ¶ 2. Based on the separate charges filed against Colston, the evidence presented at trial, the theory of the crimes as argued by the State, and the instructions the jury received, we conclude there is no possibility the jury could have based the aggravated indecent liberties conviction on the acts of sexual intercourse or oral sex.

Colston also asserts that the evidence of his putting B.N. between his legs while they were at the pool could be an act supporting a conviction of aggravated indecent liberties with a child. The State responds that it did not present evidence that Colston engaged in lewd fondling or touching with B.N. when she was on his lap. B.N. testified at trial that Colston pulled her between his legs, which made her feel uncomfortable, so she moved to his knees. Considering the definition of "lewd fondling or touching" which the jury received at trial, Colston's act of placing B.N. on his lap would not be "so clearly offensive as to outrage the moral senses of a reasonable person." Without some other evidence of lewdness, this act, by itself, would not support a charge of aggravated indecent liberties with a child.

Colston also claims that his act of removing B.N.'s clothes prior to sexual intercourse would constitute aggravated indecent liberties with a child. B.N. testified that Colston removed her clothes and initially stated he would not do anything to her. Colston paused for a moment and looked at B.N. Then he removed his clothes and had sexual intercourse with her. Applying the four *Schoonover* factors of unitary conduct to these facts, we conclude that Colston's act of removing B.N.'s clothes was incidental to the sex offenses for which he was charged and did not constitute a separate act supporting aggravated indecent liberties. Colston's act of removing B.N.'s clothes and his act of sexual intercourse with B.N. occurred at or near the same time and location without an intervening event between the two acts. Although Colston paused for a moment after removing B.N.'s clothes, there was no evidence of a fresh impulse which motivated his act of sexual intercourse with her. In fact,

Colston had already told B.N. he wanted to have sexual intercourse with her before he removed her clothes.

This leaves Colston's act of touching and licking B.N.'s breast as the only act supporting the conviction of aggravated indecent liberties with a child. As with the aggravated criminal sodomy count, B.N. initially stated at Sunflower House that this act occurred on August 12, but in her trial testimony she stated that the touching of her breast occurred on August 11. Although there was some confusion as to the date, B.N. described only one act involving the touching of her breast. The trial court initially instructed the jury that the aggravated indecent liberties count occurred on or about August 12. In response to a question from the jury, the district court clarified that with respect to the aggravated indecent liberties count, "on or about" could refer to either August 11 or 12, but the jury must be unanimous as to the date the offense occurred. As such, regarding Count IV, there is no multiple acts issue, and Colston's argument fails to survive the threshold question under the *Voyles* analysis.

*Step 2—Did the Trial Court Err?*

Because we have identified multiple acts supporting the rape conviction in Count I, we must proceed with the second step of the *Voyles* test, which is to determine whether error was committed. In a multiple acts case, either the State must inform the jury which act to rely upon in its deliberations or the court must instruct the jury to agree on the specific criminal act. The failure to either elect or instruct is error. *Voyles*, 284 Kan. 239, Syl. ¶ 2. Here, the trial court did not instruct the jury to agree on the specific criminal act supporting the rape charge in Count I. Thus, the question becomes whether the State properly informed the jury which act to rely upon to support the conviction.

In the closing argument, the State relied upon the act of penile penetration on August 11 to support the rape charge in Count I. Even though the State argued only one act to support Count I, the State failed to properly "elect" the act it was relying upon as required by *Voyles*. The second part of the *Voyles* analysis appears to be derived from *State v. Timley*, 255 Kan. 286, 289, 875 P.2d

242 (1994), which, in turn, utilized the rule applied in *State v. Kitchen*, 110 Wash. 2d 403, 409, 756 P.2d 105 (1988). The *Kitchen* court held: "[W]hen the prosecution presents evidence of several acts that could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act." 110 Wash. 2d at 409.

Here, as we have discussed, the State presented evidence of three separate acts which could have supported the rape charge in Count I based on the "on or about" language in the charging document and the jury instruction. Although the State argued that only one act supported the charge, this is not the same as informing the jury that it could not consider evidence of other acts supporting the same charge or that it must agree on the same underlying criminal act. We conclude that as to Count I, error occurred because there was a failure to elect or instruct on the underlying act supporting the charge.

*Step 3—Was It Reversible Error?*

The final step in the *Voyles* analysis is to determine whether the error is reversible error. Whether an error is reversible is governed by harmless error analysis. Colston did not request the trial court to give a unanimity instruction. The ultimate test for harmlessness when a unanimity instruction was not requested is the "clearly erroneous" standard as articulated by the Kansas Legislature in K.S.A. 22-3414(3). *Voyles*, 284 Kan 239, Syl. ¶ 3. " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.' [Citation omitted.]" *State v. Carter*, 284 Kan. 312, 324, 160 P.3d 457 (2007).

In *Voyles*, two alleged victims claimed the defendant forced them to perform multiple acts of oral sex on the defendant over a 3-month period. The victims' statements were inconsistent with each other as to the location of the acts and the number of acts that were committed. Also, the victims' trial testimony conflicted with earlier statements they had given to the police. The testimony potentially demonstrated that 20 different acts or offenses were

committed, but the defendant was charged with only 8 different crimes. 284 Kan. at 242-44. The substantial inconsistencies in the victims' allegations against the defendant led this court to conclude that the trial court's failure to give a unanimity instruction to the jury was clearly erroneous under the facts of the case. 284 Kan. at 255.

Here, Colston presented a general denial defense at trial. Colston denied removing B.N.'s clothes or engaging in any of the criminal behavior on August 11 as alleged by the State. He responded to the allegations on August 12 by presenting evidence that he and B.N. did not go to his parents' house that day. Essentially, Colston's evidence amounts to the equivalent of, "no I didn't" in response to B.N.'s allegations. The trial was substantially a credibility contest between Colston and B.N.

For the most part, B.N.'s trial testimony was consistent with her statements at Sunflower House. At trial, B.N. switched the dates of two of the offenses but this inconsistency did not involve the rape charges. B.N.'s testimony was consistent about the location of the acts and the number of times each act occurred. Significantly, the rape allegation in Count I was corroborated by Michael's eyewitness testimony that he saw Colston on top of B.N. on the bed and both of them were naked. In addition, forensic evidence of Colston's DNA in the crotch area of B.N.'s swimsuit contradicted Colston's assertion that "nothing happened" between them. A reasonable doubt on Count II may have been raised by the testimony of Colston, Betty, and Donna that B.N. did not come to the house to take care of the dog on August 12, but this does not undermine the overwhelming evidence that supported the verdict in Count I.

Based upon the record in its entirety, we are not firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. Accordingly, we conclude the trial court's failure to give a unanimity instruction on the rape charge in Count I was not reversible error.

## Multiplicitous Convictions

Next, Colston claims that his conviction of aggravated indecent liberties with a child should be vacated because it is a lesser in-

cluded offense of rape when both offenses are charged under K.S.A. 21-4643. Colston does not argue that the trial court should have given the jury a lesser included offense instruction. Instead he argues on appeal that rape and aggravated indecent liberties with a child are multiplicitous when both offenses are charged under the same statute. Colston did not raise this issue at trial, but this court may consider a multiplicity issue for the first time on appeal "to serve the ends of justice or prevent a denial of fundamental rights." *State v. Simmons*, 282 Kan. 728, 743, 148 P.3d 525 (2006). The issue of multiplicity is a question of law and this court's review is unlimited. *State v. McCarley*, 287 Kan. 167, 177, 195 P.3d 230 (2008).

Multiplicity is the charging of a single offense in several counts of a complaint or information. The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2009).

In *Schoonover*, this court announced an analytical framework for determining whether multiple convictions subject a defendant to double jeopardy. The overarching inquiry is whether the convictions are for the same offense. This inquiry is divided into two components, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? (2) If so, by statutory definition, are there two offenses or only one? 281 Kan. at 496.

Because both components must be met for there to be a double jeopardy violation, we choose to analyze Colston's multiplicity argument by proceeding directly to the second component. Assuming for the sake of argument that Colston's convictions of rape and aggravated indecent liberties with a child arose from the same conduct, the second inquiry is to determine by statutory definition whether there are two offenses or only one. The answer to this inquiry depends on whether the convictions arose from a single statute or multiple statutes. If the convictions arose from a single statute, the unit of prosecution test is applied, *i.e.*, did the legis-

lature intend to allow more than one unit of prosecution under the statute? If the convictions arose from multiple statutes, the strict elements test is applied, *i.e.*, does one statute require proof of an element not necessary to prove the other offense? 281 Kan. at 497-98.

Colston argues that his convictions of both rape and aggravated indecent liberties with a child arose from K.S.A. 21-4643. But this court has rejected the premise that K.S.A. 21-4643 is a crime-defining statute. See *State v. Bello*, 289 Kan. 191, 197-98, 211 P.3d 139 (2009); *State v. Gonzales*, 289 Kan. 351, 367, 212 P.3d 215 (2009). Instead, K.S.A. 21-4643 is the sentencing statute for certain sex offenses, including rape of a child under 14 and aggravated indecent liberties with a child under 14. Here, Colston was charged with rape under K.S.A. 21-3502(a)(2) and with aggravated indecent liberties of a child under K.S.A. 21-3504(a)(3)(A). Because Colston was charged under multiple statutes, the strict elements test is the only test that can be used to determine multiplicity. *Schoonover*, 281 Kan. at 498.

The crimes of rape and aggravated indecent liberties with a child do not have an identity of elements. Rape requires sexual intercourse. Aggravated indecent liberties consists of lewd fondling or touching done with the intent to arouse or to satisfy the sexual desires of the offender, the child, or both. Aggravated indecent liberties does not require sexual intercourse, and rape does not require the specific intent to arouse or to satisfy the sexual desires of one of the parties. See *State v. Hill*, 271 Kan. 929, 941, 26 P.3d 1267 (2001) (rape and aggravated indecent liberties not multiplicitous under strict elements test); *State v. Belcher*, 269 Kan. 2, 8, 4 P.3d 1137 (2000) (aggravated indecent liberties not lesser included offense of rape under strict elements test). Because the crimes do not contain an identity of elements, Colston's convictions of rape and aggravated indecent liberties with a child are not multiplicitous.

## COLSTON'S AGE AS AN ELEMENT OF THE OFFENSES

Colston next claims that his convictions should be reversed because the district court failed to instruct the jury to determine his

age as an essential element of each offense. The State argues that, while recent Kansas case law supports vacating Colston's sentence for this error, in those cases no evidence was presented to the jury of the defendant's age. Here, the State argues the jury heard undisputed testimony from which it could conclude beyond a reasonable doubt that Colston was at least 18 years old at the time he committed the crimes. Colston's arguments address both statutory and constitutional interpretation; therefore, this court's review is unlimited. *Bello*, 289 Kan. at 195-96 (citing *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 [2006]).

Rape and aggravated criminal sodomy with a child under 14 years of age are severity level 1 person felonies under the Kansas Sentencing Guidelines Act. K.S.A. 21- 3502(c); K.S.A. 21-3506(c). Aggravated indecent liberties committed by lewd fondling or touching of a child under 14 years of age is a severity level 3 person felony. K.S.A. 21-3504(c). However, these same crimes are off-grid person felonies when the offender is 18 years of age or older. K.S.A. 21-3502(c); K.S.A. 21-3504(c); K.S.A. 21-3506(c). The sentences for the off-grid crimes are set forth at K.S.A. 21-4643. Colston argues that this court should reverse his convictions of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child because the trial court failed to instruct the jury to determine beyond a reasonable doubt that he was at least 18 years old at the time the crimes were committed.

Several recent cases have addressed this same issue and similar facts. See *Bello*, 289 Kan. 191; *Gonzales*, 289 Kan. 351; *State v. Morningstar*, 289 Kan. 488, 213 P.3d 1045 (2009). Colston is correct that based on *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the defendant's age at the time of the offense is an element of the crime if the State seeks to convict the defendant of the more serious, off-grid level of the offense. *Bello*, 289 Kan. at 199-200; *Gonzales*, 289 Kan. at 371. In *Bello*, *Gonzales*, and *Morningstar*, this court determined that the failure to instruct the jury to make a finding on the defendant's age was error, but the result of the error was to vacate the defendant's sentence under K.S.A. 21-4643 and to remand for resentencing under the Kansas sentencing guidelines as a grid offense. *Bello*,

289 Kan. at 200; *Gonzales*, 289 Kan. at 371; *Morningstar*, 289 Kan. at 495.

In *Bello*, *Gonzales*, and *Morningstar*, the State had presented no evidence of the defendant's age. Here, the State notes there was undisputed testimony of Colston's age presented at the trial. Donna testified that she was 31 years old and that Colston was almost 20 years older than she. Michael testified that he was 29 years old at the time of trial and his sister April was 31 years old and that Colston was their father. Based on this evidence, the State argues that the trial court's failure to instruct the jury to determine Colston's age was harmless error and his off-grid sentences under K.S.A. 21-4643 should be upheld.

Whether an *Apprendi* violation is subject to a harmless error analysis was recently addressed by this court in *State v. Reyna*, 290 Kan. 666, 234 P.3d 761 (2010). In *Reyna*, the defendant was convicted of four counts of aggravated indecent liberties with a child. He was sentenced to life without possibility of parole for 25 years pursuant to K.S.A. 21-4643. The trial court did not instruct the jury that it needed to determine the defendant was at least 18 years old when the crimes were committed. However, the defendant testified at trial that he was 37 years old.

On appeal, this court recognized that in *State v. Daniels*, 278 Kan. 53, 56-63, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004), we reviewed a case in which the district court had inadvertently omitted the element of bodily harm from the jury instruction on aggravated robbery. The element of bodily harm distinguished an aggravated robbery from a simple robbery. But because the trial evidence of bodily harm was undisputed and overwhelming, the *Daniels* court found the error to be harmless. 278 Kan. at 63; see also *State v. Redford*, 242 Kan. 658, 671-72, 750 P.2d 1013 (1988) (omitted element that victim was overcome by force or fear in rape instruction was harmless error).

In finding harmless error in *Daniels*, this court considered the United States Supreme Court decision in *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999). *Neder* was a pre-*Apprendi* case in which the trial court had taken the issue of materiality from the jury in a trial involving tax fraud. The Supreme

Court concluded that refusing to instruct the jury on the element of materiality was erroneous and unconstitutional. Nonetheless, the *Neder* Court held the error was not the type that it had previously found to be structural error, *i.e.*, that type of fundamental constitutional error which is so intrinsically harmful as to require automatic reversal. 527 U.S. at 8. The *Neder* Court determined that "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." 527 U.S. at 17.

This court in *Reyna* also relied on *Washington v. Recuenco*, 548 U.S. 212, 165 L. Ed. 2d 466, 126 S. Ct. 2546 (2006), in which the United States Supreme Court addressed whether an *Apprendi* violation is structural error. In *Recuenco,* the defendant was charged with assault with a deadly weapon, specifically, a handgun. The special verdict form returned by the jury indicated the jury found a deadly weapon involved, but failed to make the specific finding of a handgun. The trial court imposed a 3-year sentence enhancement for use of a handgun instead of the 1-year enhancement that applied to the use of a deadly weapon. On appeal, the Court determined the case was indistinguishable from *Neder* except that *Neder* involved the failure to instruct the jury on an element of the crime rather than the failure to instruct the jury on a sentencing factor. 548 U.S. at 220. The Court went on to conclude that "failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error." 548 U.S. at 222.

Based on these decisions, this court determined in *Reyna* that we will apply harmless error analysis to the omission of an element from the instructions to the jury. *Reyna*, 290 Kan. 666, Syl. ¶ 9. When a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless. 290 Kan. 666, Syl. ¶ 10. We also determined that characterizing the omission of an element from the instructions to the jury as an *Apprendi*-type error, *i.e.*, as judicial factfinding of

the omitted element, when that element enhances the maximum applicable sentence, does not change the harmless error analysis. 290 Kan. 666, Syl. ¶ 11. In light of the undisputed evidence that the defendant was 37 years old, we held in *Reyna* that the trial court's failure to instruct the jury to determine the defendant's age at the time the crimes were committed was harmless error. 290 Kan. at 682.

Our holding in *Reyna* controls the outcome of Colston's case. Here, the undisputed evidence presented at Colston's trial established beyond a reasonable doubt that he was at least 18 years old when the crimes were committed. We are convinced the jury verdict would have been the same absent the error in the instructions. Accordingly, we uphold Colston's off-grid sentences under K.S.A. 21-4643.

### *ALLEN*-TYPE INSTRUCTION

Colston next claims that the trial court committed reversible error when it gave an *Allen*-type instruction to the jury before deliberations began. See *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896). Colston did not object to the instruction when it was given to the jury; therefore, this court reviews the instruction under a clearly erroneous standard. K.S.A. 22-3414(3). As previously stated, instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *Carter*, 284 Kan. at 324.

The trial court provided Instruction No. 13 to the jury:

"Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charges to a different jury at a later time. Another trial would be a burden on both sides.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be leisurely in your deliberations as the occasion may require and take all the time you feel necessary." (Emphasis added.)

The language from Instruction No. 13 came from a prior version of PIK Crim. 3d 68.12, commonly known as the "deadlocked jury" instruction. In the current pattern instruction, the language "another trial would be a burden on both sides" has been removed. Otherwise, the trial court's Instruction No. 13 tracks almost identically with the current pattern instruction.

This court has specifically addressed the language at issue in two recent cases. In *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009), this court held that the language "[a]nother trial would be a burden on both sides" is error because it is misleading and inaccurate; however, it was not reversible error. In *Salts*, the instruction was given before the jury deliberated and was included with all the other jury instructions. The defendant did not object to the instruction. The *Salts* court found that, under the clearly erroneous standard, there was no real possibility that the jury would have returned a different verdict if the error had not occurred. 288 Kan. at 267; see also *State v. Ellmaker*, 289 Kan. 1132, 1146-47, 221 P.3d 1105 (2009) (same challenged language in jury instruction was erroneous, but not clearly erroneous).

Colston argues that the language "another trial would be a burden on both sides" is reversible error in his case because there is a real possibility the jury would have rendered a different verdict without that language. First, he argues that the jury did not believe all of B.N.'s testimony because it acquitted Colston on Count II. Second, he argues that the jury was having a difficult time with Count IV because it sent a question to the trial court about the meaning of "on or about" with regard to the date the act was committed. Colston asserts that these two facts indicate that the jury may have decided to resolve its differences and reach a verdict to avoid creating an additional burden upon retrial.

As the State points out, the fact that the jury acquitted Colston of Count II does not, by itself, indicate that the jury did not believe B.N.'s testimony. Rather, it indicates that the State failed to prove Count II beyond a reasonable doubt. While the trial court did

receive a question from the jury about Count IV, the question did not clearly indicate that the jury was deadlocked. There is no reason to believe that the jury compromised its verdict on any of the counts as a result of the language in Instruction No. 13.

Instruction No. 13 was given before the jury deliberated and was included with all the other jury instructions. Colston did not object to the instruction. The jury reached its verdicts on the same afternoon that deliberations began, so the jury deliberations were not more than a few hours. After the verdicts were read, the trial court polled the jury and each juror stated he or she agreed with the verdicts. The evidence against Colston was substantial. This case is similar to *Salts* and *Ellmaker* regarding the effect of the *Allen*-type instruction, and the result should be the same. We are not firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. Accordingly, we conclude the trial court did not commit reversible error by giving Instruction No. 13.

## CUMULATIVE ERROR

Finally, Colston claims that the cumulative impact of the errors in his case deprived him of his right to a fair trial.

" ' "Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied [the defendant] a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." [Citations omitted.]' " *Ellmaker,* 289 Kan. at 1156 (quoting *State v. Brown,* 285 Kan. 261, 305-06, 173 P.3d 612 [2007]).

As we have concluded, some of the trial court's jury instructions were erroneous, but not clearly erroneous. However, none of the errors involved the admission of questionable evidence, and the evidence of Colston's guilt was substantial if not overwhelming. B.N.'s statements of what happened remained consistent. Although she switched the dates of two of the offenses at trial, the details about the acts remained consistent, as did the number of times each act occurred. Michael corroborated B.N.'s testimony about the incident on August 11, testifying that he saw B.N. and

Colston naked in the basement. The State also presented forensic evidence of Colston's DNA on the crotch of B.N.'s swimsuit. Given the evidence, we are firmly convinced that the cumulative effect of any errors committed by the trial court did not deprive Colston of his right to a fair trial.

Affirmed.

DAVIS, C.J., not participating.
MALONE, J., assigned.

\* \* \*

JOHNSON, J., dissenting: I respectfully dissent on the issue of the missing element of defendant's age, as I did in *State v. Reyna*, 290 Kan. 666, 690, 234 P.3d 761 (2010) (Johnson, J., dissenting).