NOT DESIGNATED FOR PUBLICATION

No. 121,781

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HECTOR ARTURO AMARO,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Seward District Court; BRADLEY E. AMBROSIER, judge. Opinion filed November 20, 2020. Affirmed.

*James C. Dodge*, of Sharp McQueen, P.A., of Liberal, for appellant.

*Russell Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., BUSER and BRUNS, JJ.

PER CURIAM:  Hector Arturo Amaro appeals the district court's denial of his K.S.A. 60-1507 motion alleging ineffective assistance of counsel. Amaro presents three issues for our consideration. First, he asserts his attorney was ineffective for failing to object or move for a mistrial when the district court was advised that some jurors were concerned about the possible presence of gang members in the courtroom during the trial. Second, Amaro claims his attorney was ineffective when he failed to object when Amaro was handcuffed in the courtroom during the jury's announcement of its verdict. Third, Amaro contends his attorney was ineffective when he failed to object to multiplicitous convictions.

1

Upon our review, we hold the district court did not err in denying Amaro's K.S.A. 60-1507 motion. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Amaro was convicted of aggravated kidnapping in violation of K.S.A. 2013 Supp. 21-5408(b), aggravated battery in violation of K.S.A. 2013 Supp. 21-5413(b)(1)(C), aggravated intimidation of a witness in violation of K.S.A. 2013 Supp. 21-5909(b), and criminal threat in violation of K.S.A. 2013 Supp. 21-5415(a)(1). Amaro filed a direct appeal to our court, claiming trial errors regarding a jury instruction, insufficient evidence, prosecutorial misconduct, and cumulative error. Finding no reversible error, we affirmed the convictions. *State v. Amaro*, No. 114,238, 2017 WL 1822303, at *10 (Kan. App. 2017) (unpublished opinion). In that opinion, we summarized the trial evidence:

"On the evening of April 28, 2014, Julio Ruiz was visiting Adrian Molina at his house. Miguel Mariscal was also present. While Ruiz and Molina were in the living room, five members of the Sureño gang arrived at the house. Molina spoke to the men in the kitchen. Eventually, Molina informed Ruiz that the men were talking about 'jumping' him and that he should leave. Ruiz believed that the men were there to beat him up because he was considered a 'snitch' after he testified against a codefendant at a preliminary hearing in a robbery case.

"Ruiz went outside and the group of men followed. Before Ruiz could get away, the men told him that they needed to talk to him inside. Once inside the house, the five men confronted Ruiz and accused him of being a snitch. According to Ruiz, a man who the others called 'Animal' put his hand on Ruiz' chest and said they should go outside to talk. The man called 'Animal' was later identified to be Amaro. As Ruiz began to open the door, Amaro hit him in the side of the head. The other men jumped in and also began hitting Ruiz. As a result of the beating, Ruiz' face became bloodied.

"Ruiz was allowed to go to the bathroom to wash the blood off his face. Although Ruiz thought about attempting to escape from the bathroom window, he did not think he could open the window without the men hearing him. When he came out of the

2

bathroom, the men cornered him in the kitchen and again began to accuse him of being a snitch. Once again, Amaro and the other men began beating him. The men beat Ruiz with a chair, knocking him to the floor, and began kicking him in the head. They then made Ruiz take off his shirt and use it to clean up his blood from the floor.

"The men then placed Ruiz in a chair facing the corner of the kitchen. Amaro told him that if he ever told anyone what happened, the results would be 10 times worse. Amaro also indicated that he might prevent Ruiz from leaving the house permanently and said that there was plenty of room left in the fields. Ruiz later indicated that he believed that Amaro was threatening his life.

"The men began to beat Ruiz for a third time. After knocking him to the ground, the men broke a chair over him. One of the men then began to repeatedly thrust a broken chair leg into Ruiz' face. Amaro also repeatedly slapped Ruiz in the face with the wire handle of a flyswatter. Several of the men began to say that Ruiz had been beaten enough and asked Amaro to stop. Molina also tried to stop the beating but Amaro threatened him and made him punch Ruiz. Ruiz later testified that he was too scared to move and that he felt that he was not able to leave the house." 2017 WL 1822303, at *1.

After his direct appeal was final, on October 22, 2018, Amaro filed a pro se K.S.A. 60-1507 motion which is the subject of this appeal. In the motion, Amaro alleged numerous instances of ineffective assistance of trial counsel. On March 19, 2019, after appointing counsel to represent Amaro, the district court held an evidentiary hearing on the K.S.A. 60-1507 motion. After taking the matter under advisement, on April 11, 2019, the district court issued an 18-page order. In the comprehensive order, the district court summarized the trial evidence, made findings of fact regarding the evidence presented at the evidentiary hearing, and stated legal conclusions upon which the district court based its decision to deny Amaro's K.S.A. 60-1507 motion.

Amaro filed a timely appeal.

3

BRIEF SUMMARY OF RELEVANT LAW AND STANDARDS OF REVIEW

A district court has three options when handling a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018).

Our standard of review depends upon which of the three options a district court employs. 308 Kan. at 504. Here, the district court held a full evidentiary hearing on all the issues that Amaro raises on appeal. After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2020 Kan. S. Ct. R. 223). An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *Fuller v. State*, 303 Kan. 478, 485-86, 363 P.3d 373 (2015).

On appeal, Amaro raises three claims of ineffective assistance of counsel in his K.S.A. 60-1507 motion. The right of an accused to have assistance of counsel for his or her defense is guaranteed by the Sixth Amendment to the United States Constitution. The right is "applicable to state proceedings by the Fourteenth Amendment." *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). Moreover, the guarantee includes not only the presence of counsel, but counsel's effective assistance as well. *Sola-Morales v. State*, 300

Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). Thus, Amaro claims he was denied a constitutional right.

> "To prevail on a claim of ineffective assistance of trial counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. [Citations omitted.]" *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. *Fuller*, 303 Kan. at 488. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). As the movant, the burden of proof to establish ineffective assistance of counsel is on Amaro. See *Fuller*, 303 Kan. at 486.

Each of Amaro's three claims of ineffective assistance of counsel will be discussed separately.

### FAILURE TO MAKE A RECORD OR MOTION FOR MISTRIAL DUE TO JURORS' SAFETY CONCERNS

Amaro contends his trial attorney was ineffective for failing to object or move for a mistrial after learning that some jurors reported they were concerned about gang members being in the courtroom during the trial. Amaro asserts his attorney should have made a record of the conversation that took place in chambers between Deputy Court Clerk Donna Odneal, the judge, and attorneys, or moved for a mistrial. Amaro claims

5

prejudice due to possible racial animus because the jurors reported feeling unsafe when, according to Amaro, the people in the gallery were primarily Hispanic.

Based on the hearing evidence, the district court found that during the trial, Odneal relayed to the judge and counsel in chambers "that members of the jury had some personal safety concerns." According to the district court: "At no time during the trial were there any difficulties presented from any members of the gallery." Moreover, although Amaro's family members were in the courtroom, Amaro had not shown "that any persons in the courtroom were identified by clothing, tattoos or any other markings as gang members." Based on these factual findings, the district court concluded:

"As it relates to [Amaro's] first 2 issues, the Court is convinced that the standards set forth have not been met by [Amaro]. As to the allegation of gang members' presence in the courtroom somehow improperly influencing the jury, the Court is not convinced as a factual matter that any persons were in the Court gallery, other than 1 witness to the crime who was subpoenaed by the State and other supporters of the then defendant. Furthermore, there is absolutely no evidence that the presence of any persons had any impact upon the jury verdict whatsoever. The crimes in which [Amaro] stands convicted were, in a word, brutal. The testimony established beyond a reasonable doubt to this jury that a victim was brutally beaten over a course of time in retaliation for his cooperation with local authorities. Sitting in judgment of one so accused could give reasonable jurors some concern. To ask that their names not be read during the polling procedure and to request law enforcement be present as they exit the courthouse to their automobiles is nothing more than a reasonable request under such circumstances. [Amaro] has failed to show that [his counsel] was in any way ineffective for failing to place said facts into the record at the time of the trial or to request the Court to take any action in that regard. Even with complete and total hindsight at this point, the Court sees nothing deficient in [Amaro's counsel's] performance. Furthermore, there is absolutely no indication that the jury verdict was in any way affected by these alleged fears."

Upon our review, the district court's factual findings and legal conclusions were supported by substantial competent evidence. Odneal testified that she did not recall any

courtroom spectators who looked like gang members and she did not see anything occur in the courtroom that alarmed her. Sergeant Josh Olson, the lead investigator in the case, testified that while Amaro was a member of a gang, the only other gang member he recognized in the courtroom was Molina, who owned the house where the attack occurred, and who was a potential witness. Sergeant Olson indicated that while there were a few other spectators in the courtroom, he assumed they were members of Amaro's family.

Amaro's only evidentiary basis to support his claim derives from the fact that a juror notified the court clerk that some jurors were concerned about their safety. But, as Amaro acknowledges in his brief, there is no explanation as to what caused the jurors' concern. Amaro merely speculates that the jurors "believed stereotypically that all Hispanics in the courtroom were gang members." This claim is conclusory and without factual support in the record.

As summarized earlier, to prevail on this issue Amaro must demonstrate his attorney's deficient performance and prejudice. See *Salary*, 309 Kan. at 483. On this record, Amaro has failed in both aspects of the ineffective assistance of counsel test. As to deficient performance, the evidence supports the district court's legal conclusion that Amaro has failed to show any basis to find his attorney was ineffective in making a record of the court clerk's remarks or any basis to move the court to declare a mistrial.

Regarding prejudice, as the district court found, Amaro failed to prove "there is a reasonable probability the jury would have reached a different result absent the deficient performance." 309 Kan. at 483. As our court noted in Amaro's direct appeal, the evidence produced against him at trial was strong. Moreover, the jury acquitted Amaro of conspiracy to commit aggravated kidnapping. This would suggest that the jury did not allow prejudice to adversely affect their decision making against Amaro.

7

In summary, we conclude the district court's findings of fact were supported by substantial competent evidence and were sufficient to support the court's conclusions of law that Amaro's attorney was not ineffective for failing to object or move for a mistrial upon learning of some jurors' safety concerns. Additionally, consistent with the district court's findings, we do not discern prejudice as a result of the attorney's performance.

### FAILURE TO MAKE A RECORD OR MOTION FOR MISTRIAL DUE TO HANDCUFFING OF AMARO

For his second issue, Amaro contends his attorney was ineffective for failing to object or move for a mistrial when the district court ordered Amaro handcuffed in the courtroom when the jury returned with its verdict.

The district court,

"found that for safety concerns and as the presiding judge, ordered [Amaro] to be handcuffed at counsel table **during the reading of the verdict**. The jury never saw and [Amaro] never was restrained in the presence of the jury at any time during the trial or deliberations and the only restraints placed upon [Amaro] were done so after the jury had reached a verdict, but before that verdict was delivered to the Court."

Based on these factual findings, the district court made conclusions of law:

"As to [Amaro's] restraint argument, the facts are clearly established that [Amaro] was not restrained at any point in the process in which said restraint could have adversely affected the jury verdict. The evidence clearly establishes that the Court received some sort of credible evidence as to a possible safety concern. In an effort to procure a safe courtroom, as is not only the judge's right but his responsibility, Judge Peterson took reasonable action. Furthermore, this action was not implemented at any time in the presence of the jury until their verdict had been reached and they were present in the courtroom to announce that verdict on the record. There is simply no credibility to [Amaro's] argument that his restraint in any way shows that his lawyer acted

8

inappropriately or that any conduct on behalf of [Amaro's counsel] adversely affected the outcome of the trial."

The district court's factual findings and legal conclusions were supported by substantial competent evidence. At the K.S.A. 60-1507 hearing, Amaro's trial attorney testified that the district judge told him that Amaro was going to be handcuffed prior to the jury returning to the courtroom to announce its verdict because he was concerned for the attorney's safety. The basis for the district court's concern was a report from the sheriff's department that Amaro was going to hit his attorney if the jury returned a guilty verdict. Amaro's attorney learned from the sheriff's department about the specific threat after the trial but before sentencing. For his part, Sergeant Olson testified that he heard during a lunch break about Amaro threatening to hit his attorney if he was found guilty at trial.

Under the first prong of ineffective assistance of counsel analysis, Amaro must demonstrate that his counsel's performance was deficient under the totality of the circumstances. See 309 Kan. at 483. But Amaro does not favor us with any caselaw precedent involving a similar factual situation wherein a trial court held that counsel was ineffective for failing to object or make a motion for mistrial when the defendant was handcuffed in the courtroom after the jury had reached its verdict.

In *State v. Race*, 293 Kan. 69, 82, 259 P.3d 707 (2011), our Supreme Court explained that, "[g]enerally, we have held that shackling or otherwise restraining a defendant while in the view of the jury is appropriate only in limited circumstances and for particularly dangerous defendants." Our Supreme Court instructed:

> "'[t]he basic principle involved is an accused's right to the presumption of innocence until
> guilt is proved beyond a reasonable doubt; however, the accused's rights must be
> balanced with the duty of the trial judge to protect the lives of the trial participants and to

9

protect the institution of the judicial process.'" 293 Kan. at 83 (quoting *State v. Cahill*, 252 Kan. 309, 315, 845 P.2d 624 [1993]).

We are persuaded that the circumstances involving Amaro being handcuffed after the jury had reached a verdict were justified given the district court's knowledge of the possible threat of physical violence to Amaro's attorney. Moreover, the trial evidence detailed Amaro's ability to engage in physical violence. Given the specific threat communicated to the district court, the handcuffing of Amaro as his attorney was nearby in the courtroom was an appropriate precaution under *Race*. Given that the district court appropriately exercised its judicial discretion, we discern no ineffectiveness by Amaro's attorney in failing to object to the handcuffing or to move for a mistrial.

Moreover, assuming for purposes of argument that Amaro's attorney was deficient in his performance, Amaro has not shown the second prong of the ineffective assistance of counsel test: "prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance." *Salary*, 309 Kan. at 483. Our Supreme Court has defined reasonable probability as "'a probability sufficient to undermine confidence in the outcome.' [Citations omitted.]" *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

As Amaro acknowledges in his brief: "The record is clear that the juror's decision had been reached before they saw [Amaro] in handcuffs." Still, Amaro argues that the jury seeing him in handcuffs prior to announcing its verdicts and being polled as to the verdicts called into question the validity of his convictions. We are not persuaded.

As the district court concluded: "There is simply no credibility to [Amaro's] argument that his restraint in any way shows that his lawyer acted inappropriately or that any conduct on behalf of [Amaro's counsel] adversely affected the outcome of the trial." Our review of the record reveals no abnormality in the polling of the jurors or their

10

responses after the verdicts were announced. There is no showing in the record that any juror was influenced in any way. Moreover, the fact that the jurors only observed Amaro in handcuffs after they had arrived at their verdicts, completed the verdict forms, and entered the courtroom to announce the verdicts, is indicative that if Amaro had not been handcuffed at this stage of the trial, there is not a reasonable probability the jury would have reached a different result.

We conclude the district court's findings of fact were supported by substantial competent evidence and were sufficient to support the court's conclusions of law that Amaro's attorney was not ineffective for failing to object or failing to move for a mistrial upon learning that Amaro would be handcuffed after the jury had arrived at its verdicts. Additionally, in accordance with the district court's findings, we do not find any prejudice as a result of his attorney's performance.

FAILURE TO OBJECT TO MULTIPLICITOUS CONVICTIONS

For his final issue on appeal, Amaro contends his attorney's failure to object to the multiplicitous nature of the four crimes for which he was convicted was ineffective assistance of counsel. In particular, Amaro argues that his convictions for aggravated kidnapping and aggravated battery were multiplicitous because "one cannot commit aggravated kidnapping without also committing aggravated battery at the same time." Additionally, Amaro asserts that his convictions for aggravated intimidation of a witness and criminal threat were multiplicitous because "one could not commit aggravated intimidation of a witness without also making a criminal threat."

The district court rejected Amaro's claims that his convictions were multiplicitous. Given this legal conclusion, the district court also found that Amaro's attorney was not ineffective for failing to object to multiplicitous convictions during or after the trial.

Whether crimes are multiplicitous is a question of law and an appellate court's review is unlimited. *State v. Colston*, 290 Kan. 952, 971, 235 P.3d 1234 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Multiplicity "is the charging of a single offense in several counts of a complaint or information," and the principal danger "is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights." *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2009).

In *State v. Schoonover*, 281 Kan. 453, 463-64, 133 P.3d 48 (2006), our Supreme Court discussed how the United States Supreme Court historically addressed multiplicity. In the first layer of analysis, the United States Supreme Court divides the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution into three categories: "(1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." 281 Kan. at 463 (citing *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 [1969], *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 [1989]).

After discussing the historical context, our Supreme Court held that the same analysis should apply to Kansas cases. *Schoonover*, 281 Kan. at 474-75. In this regard, Amaro's case fits within the third category because he does not make any argument concerning a successive prosecution, either after an acquittal or a conviction, but he is concerned about receiving multiple punishments for the same crime. See 281 Kan. at 464.

The second layer of the analysis focuses on whether the defendant was prosecuted for the same offense. In deciding what constitutes a "same offense," cases are divided into two categories. "In one, the defendant is charged with violations of multiple statutes that may or may not be deemed the same offense. . . . In the second category, the

defendant is charged with multiple violations of the same statute." 281 Kan. at 464. When, as here, a defendant is charged with violations of multiple statutes, a court must determine whether the charges are for the same offense. "There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?" 281 Kan. at 496.

The possibility of a double jeopardy violation only arises if the conduct is unitary. To determine whether the convictions arise from the same conduct, a court must consider several factors, including:

> "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. at 497.

If the conduct is deemed unitary, then a court uses the same elements test to determine whether there is a double jeopardy violation when the defendant was convicted of multiple violations of different statutes. "[T]he test is: Does one statute require proof of an element not necessary to prove the other offense? If so, the statutes do not define the same conduct and there is not a double jeopardy violation." 281 Kan. at 498.

Here, as Amaro points out, the district court "apparently assumed the first step had been met, and proceeded to apply the second." We agree. It is apparent the district court implicitly concluded that Amaro's convictions arose from the same conduct. Neither Amaro nor the State objects to this finding.

To determine whether Amaro's convictions arose from the same conduct, we must apply the factors our Supreme Court laid out in *Schoonover*. Each of Amaro's four

13

charges arose from conduct that occurred on the night of April 28 into the early morning of April 29, 2014. All the acts occurred during a one-and-a-half- to two-hour time period at Molina's house. Amaro threatened Ruiz in between instances of beating him without an intervening event. During the time Ruiz was at Molina's house, Amaro repeatedly beat him. We are persuaded that Amaro's convictions arose from the same conduct. See 281 Kan. at 497.

The district court then applied the second component of the inquiry: Does one statute require proof of an element not necessary to prove the other offense? On appeal, both parties focus their argument on the second component of the inquiry. We will separately analyze the two sets of convictions that Amaro claims are multiplicitous.

*Aggravated Kidnapping and Aggravated Battery*

The second component requires our court to determine if the statute for aggravated kidnapping requires an element not necessary to prove aggravated battery. See 281 Kan. at 498. The jury instruction setting forth the elements of the crime of aggravated kidnapping stated in relevant part:

> "To establish this charge, each of the following claims must be proved:
> "1. The defendant confined Julio Ruiz by force or fear.
> "2. The defendant did so with the intent to hold Julio Ruiz to inflict bodily injury on or to terrorize Julio Ruiz.
> "3. Bodily harm was inflicted upon Julio Ruiz.
> "4. This act occurred on or about the 28th to the 29th day of April, 2014, in Seward County, Kansas."

See K.S.A. 2013 Supp. 21-5408(b).

14

The jury instruction setting forth the elements of the crime of aggravated battery stated in relevant part:

> "To establish this charge, each of the following claims must be proved:
>
> "1.     The defendant knowingly caused physical contact with Julio Ruiz in a rude, insulting or angry manner in any manner whereby great bodily harm, disfigurement or death can be inflicted.
>
> "2.     This act occurred on or about the 28th to the 29th day of April, 2014, in Seward County, Kansas."

See K.S.A. 2013 Supp. 21-5413(b)(1)(C).

Applying the same elements test, it is apparent that Amaro's conviction for aggravated kidnapping required that he confined Ruiz, while his conviction of aggravated battery did not require any confinement. On the other hand, Amaro's conviction for aggravated battery required that the physical contact occurred in a manner whereby great bodily harm, disfigurement, or death can be inflicted. To commit aggravated kidnapping, however, does not require that the physical contact occurred in a manner whereby great bodily harm, disfigurement, or death can be inflicted. Only bodily harm is required. As a result, under the same elements test, the two convictions are not multiplicitous.

*Aggravated Intimidation of a Witness and Criminal Threat*

Next, we consider whether the statute for aggravated intimidation of a witness requires an element not necessary to prove criminal threat. See 281 Kan. at 498. The jury instruction setting forth the elements of the crime of aggravated intimidation of a witness stated in relevant part:

15

"To establish this charge, each of the following claims must be proved:

"1.     The defendant attempted to dissuade a victim, Julio Ruiz, from causing the arrest of any person in connection with the victimization of . . . Julio Ruiz.

"2.     This act was done with the intent to vex, annoy, harm or injure Julio Ruiz.

"3.     This act was accompanied by an expressed threat of violence against . . . Julio Ruiz.

"4.     This act occurred on or about the 28th to the 29th day of April, 2014, in Seward County, Kansas."

See K.S.A. 2013 Supp. 21-5909(a)(2)(D), (b)(1).

The jury instruction setting forth the elements of the crime of criminal threat stated in relevant part:

"To establish this charge, each of the following claims must be proved:

"1.     The defendant threatened to commit violence and communicated the threat with the intent to place another in fear.

"2.     This act occurred on or about the 28th to the 29th day of April, 2014, in Seward County, Kansas."

See K.S.A. 2013 Supp. 21-5415(a)(1).

Applying the same elements test, it is apparent that Amaro's conviction for aggravated intimidation of a witness required an attempt to dissuade a witness or victim from causing the arrest of a person in connection with the victimization of the witness or victim. No such element is part of the elements of the crime of criminal threat. On the other hand, Amaro's conviction for criminal threat required that he had a specific intent to place another in fear. No such specific intent is required as an element of aggravated

16

intimidation of a witness. On the contrary, that statute required Amaro to have a different specific intent—to vex, annoy, harm, or injure Ruiz.

Applying the double jeopardy principles established in *Schoonover*, we conclude that regarding the two sets of convictions Amaro complains of, each offense required proof of an element not necessary to prove the other offense. Accordingly, since there was no double jeopardy violation, the district court did not err in ruling that Amaro's attorney was not ineffective for failing to object to multiplicitous convictions during or after the trial.

Affirmed.