No. 105,995

STATE OF KANSAS, *Appellee*, v. CHRIS KING, *Appellant*.

(323 P.3d 1277)

Opinion filed May 16, 2014.

*Reid T. Nelson*, Capital and Conflicts Appellate Defender, argued the cause and was on the brief for appellant.

*Cheryl A. Marquardt*, assistant county attorney, argued the cause, and *Todd L. Thompson*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: A jury convicted Chris King of four charges: rape by penile penetration, rape by digital penetration, aggravated criminal sodomy, and aggravated indecent liberties with a minor. The district court judge sentenced King to four concurrent hard 25 life sentences under Jessica's Law. King raises seven issues on this direct appeal: (1) admission of evidence on a prior charge of sexual abuse for which King was acquitted; (2) failure to provide a unanimity instruction; (3) exclusion of evidence of the victim's prior sexual history; (4) denial of defense challenges to venire members for cause; (5) cumulative error; (6) constitutionality of Jessica's Law; and (7) denial of a sentencing departure motion.

Because we hold that King's convictions must be reversed for the lack of a unanimity instruction he challenges on his second issue, we need not reach the merits of King's fourth, fifth, and sixth issues. We provide limited guidance on his first and third issues because of the likelihood they will arise again in the event of a retrial. We also provide guidance on the seventh issue, in the event resentencing becomes necessary. We take the liberty of reordering King's issues for clarity of discussion.

## FACTUAL AND PROCEDURAL BACKGROUND

R.B. and her brother, M.B., began living with defendant King and the children's aunt, King's wife, Roxanne, in fall 2005. While the children lived with the Kings, Roxanne was primarily responsible for their care because King worked second shift. During weekends and school vacations, the children usually were with either their father or their grandparents.

On January 3, 2008, R.B. and M.B. went to their grandparents' home for the end of winter break from school. And, on January 7, 2008, R.B. told her grandmother that King had been touching her and making her do things to him, the last time on the morning she arrived at her grandparents' home.

R.B.'s grandmother took R.B. to the King residence to speak with Roxanne. R.B., her grandmother, and Roxanne went into a bedroom to talk about what R.B. had said. According to the grandmother's later testimony, when Roxanne learned of R.B.'s allegations, "[s]he really didn't seem surprised. She was upset. She was upset, and she seemed to feel very bad about [R.B.], but she didn't seem surprised." Roxanne, on the other hand, said that, when the three went into the bedroom, "[R.B.] climbed up on the middle of my bed and starts giggling and says, 'Uncle Chris touched me.'" Roxanne asked R.B. if King had " 'put his penis in' " R.B., and R.B. responded, " 'What's that?' "

After the discussion in the bedroom, R.B.'s grandmother removed the children from the care of the Kings.

R.B.'s mother contacted the Department of Social and Rehabilitation Services (SRS) hotline the next day. Sharon Griffin, a social worker, scheduled a time 2 days later to meet with R.B.

Griffin spoke with R.B., M.B., and their mother. During R.B.'s interview, she disclosed that King sexually molested her. According to R.B., on the morning of January 3, King told her to come into the bathroom with him. Once inside the room, King showed R.B. his penis, then pulled down her pants, and, according to R.B., " 'touched my private.' " King then made her " 'sit on his lap and promise not to tell.' " R.B. said that this incident was not the first of its kind. At the conclusion of the meeting, Griffin asked the children's mother to make a police report and explained that she would be referring R.B. to Sunflower House for a forensic interview. As part of the referral, Griffin also requested a medical examination of R.B.

Approximately 2 weeks later, Sarah Byall conducted a forensic interview of R.B. at Sunflower House. During the Byall interview, R.B. identified three specific areas of King's residence where he had sexually abused her: her bedroom, a bathroom, and on a couch. R.B. also described King's penis and told Byall that her "pee-pee started hurting." It is unclear whether the pain began before or after R.B. was removed from the care of the Kings.

A week later, Physician Assistant Stephanie Painter conducted a medical examination of R.B. During the examination, R.B.'s mother told Painter that R.B. had experienced some bleeding, which, according to Painter, would be consistent with allegations of sexual abuse. Painter's examination did not reveal injury to R.B.'s hymen or vulva or any sign of infection.

After viewing R.B.'s Sunflower House interview, Deputy Sheriff Robert Smith spoke to King less than a week later. King told Smith that "[R.B.] has a vivid imagination and we've been trying to get her some type of counseling."

King first went to trial on the charges involving R.B. in November 2009. Mistrial followed the revelation of potentially exculpatory evidence, previously unknown to the State and the defense. The retrial leading to this appeal began October 25, 2010.

Pretrial, the State moved to admit evidence under K.S.A. 2013 Supp. 60-455(d) that King had sexually abused another girl in the past. King argued the evidence was inadmissible because he had been acquitted on charges arising out of the allegations. The district

judge ruled that the State would be allowed to admit the evidence. As a result, J.B. testified at King's trial that King had molested her when she was 4 years old and staying with her aunt. According to J.B., King touched her "on my vagina and, basically, I guess, rubbed" it while she was sleeping. J.B.'s aunt also testified about what J.B. had told her on the morning of the alleged abuse.

Pursuant to K.S.A. 21-3525(b), King filed a pretrial motion to admit evidence of previous sexual abuse allegations made by R.B. against two juveniles. King argued that the evidence was relevant, regardless of whether the allegations against the juveniles were true:

"Either these are false accusations and therefore the complaining witness' testimony regarding actions by the defendant against her are not believable and trustworthy, or they [are] true accusations[,] which could explain how it is that she is able to describe sexual activities and body parts that one would normally not believe a small child should be able to describe."

The district judge denied King's motion, ruling the evidence was inadmissible because "we are not certain if [the allegations] were unfounded or not followed up because of just time constraints of law enforcement or lack of interest in pursuing the matter." King also sought to admit evidence that R.B.'s mother had been sexually abused, information which she disclosed in front of R.B. during joint therapy sessions. The district judge's ruling did not specifically address this evidence. King's renewed motion to admit the evidence of the allegations against the juveniles also was denied during trial.

The State's evidence at trial included establishment of dates and times when King had the opportunity to be alone with R.B. It demonstrated that R.B. had been absent from school because of illness on November 5 and 6, 2007, and that school was cancelled on December 11 and 12, 2007, because of snow. In addition to those dates, school was not in session on September 14 and 17; October 12; November 12 and 21; and December 27 through January 3, 2008. On the dates that R.B. was not in school, the State established that Roxanne generally worked for a few hours each morning and that King generally did not begin work until approximately 3 p.m., if at all. It was during these times, when Roxanne

was working and King was home alone with the children, that the State argued King had the opportunity to abuse R.B.

The jury also heard testimony from those who had examined R.B.'s physical and mental condition after the report of her abuse. Painter testified that the physical examination of R.B. indicated that R.B. was "normal for her stage of development" and that she did not show any signs of injury. Painter opined that this could "not exclude or confirm a diagnosis of child sexual abuse." Because of the time between the last alleged abuse and the examination, she would "expect a child to be totally normal; and if there had been injury, for it to have healed by that time."

R.B.'s therapist, Annette Rasmussen, testified that R.B. had "behaviors like increased masturbation and dissociating and being depressed, hard time sleeping, being scared to get dressed." Rasmussen further testified that there could be a correlation between R.B.'s masturbation and sexual abuse and that dissociation happens when people have "a traumatic experience happen to them."

After Rasmussen testified, King renewed his pretrial motion to admit evidence of prior sexual abuse of R.B. King argued that the connection Rasmussen made between some of R.B.'s behaviors and sexual abuse or a trauma meant that evidence of prior abuse would provide the jury with an alternative source for R.B.'s behaviors. The district judge ruled that "[Rasmussen's] reference during cross-examination was not so specific, to this Court's belief, that it would trigger a reversal of prior rulings denying the admissibility of that evidence. It was brief and nondescript."

R.B. testified that King touched her "over 20 times." This included King touching her "[b]oth inside and out" with his hand and penis, putting his penis in her mouth, and making her touch his penis with her hands. The State also played a video of R.B.'s Sunflower House interview for the jury.

In addition to R.B.'s testimony about the incidents, M.B. testified that he once saw King and R.B. go into another room and shut the door. According to M.B., they had been playing the "tickle game" when King said to R.B., " 'Want to go into the bedroom and just me and you play?' " M.B. listened by the closed door, and he did not hear any tickling or laughing. He asked, " 'You guys almost

done?'" Because M.B. did not hear laughing, he said, he "knew they weren't playing [the tickle game]."

With the exception of November 5, one of the snow days, and the morning of January 3, King denied that he was supervising or alone with the children. He testified that the children were with their parents or grandparents on the remaining dates. On November 5, when R.B. was home sick, King said, he took R.B. and his son to Lawrence to purchase a video game. King said that they did not return that morning until after 11, and his wife arrived home a short time later. King submitted evidence from his bank records of a transaction occurring on the morning of November 5 at GameStop in Lawrence. During the snow day, King said, he and the children played a game of Monopoly all day until Roxanne came home from work.

On the morning of January 3, King testified, R.B. and M.B. were scheduled to go to their grandparents' home. Roxanne and King got the children into the car, and King drove Roxanne to work. After dropping Roxanne off, King and the children returned home because it was not yet time to meet the grandparents. King went into the bathroom because he felt ill, and he testified that he remained there until it was time to drive the children to meet their grandparents. The children were in the living room while King was in the bathroom.

King also denied all of R.B.'s accusations of abuse.

King also presented evidence implying that R.B.'s mother fabricated the allegations against him as a way to avoid paying to support the children while they were in King's and Roxanne's care. According to Roxanne, SRS had recently learned the children's mother was not paying child support and had ordered her to begin doing so.

After the jury returned guilty verdicts on all four charges and before sentencing, King filed a "Motion for Durational and Dispositional Departure" in which he sought "a downward durational departure pursuant to the provisions set forth in K.S.A. 21-4643." The district judge noted that "the legislature has precluded the Court from consideration of any mitigating factors" and said, "I cannot find that there is sufficient grounds of unconstitutionality

to set aside the Sentencing Act" and, "without it being unconstitutional, I'm precluded from even considering your arguments . . . today to mitigate or to lessen the sentence. The law is quite clear." King received four concurrent hard 25 life terms.

## UNANIMITY

We treat the question of whether a case presents a multiple acts issue as one of law over which we have unlimited review. *State v. [Kameron] King*, 297 Kan. 955, 979, 305 P.3d 641 (2013) (citing *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 [2007]). Further, "[w]here an instruction was not requested during the trial, an appellate court applies a clearly erroneous standard of review." *[Kameron] King*, 297 Kan. at 978 (citing K.S.A. 22-3414[3]). Whether the failure to give a unanimity instruction in a multiple acts case is clearly erroneous involves a de novo review of the entire record. *State v. Trujillo*, 296 Kan. 625, Syl. ¶ 3, 294 P.3d 281 (2013). "Whereas the burden to show harmlessness generally shifts to the party benefitted by the error, the burden to show clear error under K.S.A. 22-3414(3) remains on the defendant." *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012).

When multiple acts jury unanimity is an issue on appeal, the threshold question is whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. See *Voyles*, 284 Kan. 239, Syl. ¶ 1. This court has determined that acts are multiple acts if they are factually separate and distinct. And incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a later criminal act is motivated by a "fresh impulse." *State v. Colston*, 290 Kan. 952, 962, 235 P.3d 1234 (2010). Factually separate and distinct incidents are not what this court calls "unitary conduct." 290 Kan. at 962. The factors we have used to determine the existence of unitary conduct are: " '(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.' [Citation omitted.]" 290 Kan. at 962.

King asserts that there was evidence of multiple acts on each of his charges because the State demonstrated that the abuse could have occurred on 11 different days from September 2007 to January 2008, and R.B. said King touched her "over 20 times" in three different places in the house—her bedroom, the bathroom, and on a living room couch. The State's primary argument on this issue is that King categorically and generally denied all of R.B.'s abuse allegations. But such a denial affects only whether any multiple acts error is reversible—here, clearly erroneous. It does not determine whether we are faced with a multiple acts case in the first place.

In *Voyles*, we recognized that a case in which two victims alleged that the defendant's criminal conduct occurred over several months in different locations presented us with multiple acts. 284 Kan. at 244. "[P]otentially 20 different acts or offenses were committed," and the defendant was charged with only eight counts. 284 Kan. at 244; see also *State v. Rivera*, 48 Kan. App. 2d 417, 449, 291 P.3d 512 (2012) (allegations of two acts over several days required multiple acts instruction, election).

We agree with King that we are faced with a multiple acts situation in this case. R.B.'s allegation of more than 20 different incidents in three different locations and the State's proof of 11 different opportunities for King to be alone with the children mean we are not dealing with "unitary conduct." See *Colston*, 290 Kan. at 962. Yet King was charged in only four counts, two rape counts, one aggravated criminal sodomy count, and one aggravated indecent liberties count.

A particular further note on the sodomy count is necessary.

The State insists that R.B. reported only one instance of oral sex and relies on *Colston*, 290 Kan. at 965, to argue that a jury is not required to agree on a specific date of a sodomy if only one act occurred. We acknowledge and reaffirm this holding from *Colston*, but we see a controlling distinction between *Colston* and this case.

Here, although R.B. testified that King made her put her mouth on his penis only one time, the prosecution's proof and later argument on King's 11 chances to be alone with the children muddied the evidentiary water on the sodomy charge. When, for ex-

ample, the prosecutor argued in closing that King had plenty of time to molest R.B., she posed the rhetorical question: "How much time does it take for Mr. King to pull down his pants and force 8-year-old [R.B.] to perform oral sex on him?" The prosecutor followed this question by directing the jury to the State's evidence of the 11 different days when King had opportunity to commit the charged offenses. In other words, the State asserted that the jury could infer multiple acts of sodomy from the whole of its evidence. This statement was essentially equivalent to a reverse election that competed with R.B.'s statement about one instance of oral-genital contact. We therefore regard the sodomy charge as subject to multiple acts analysis.

Having concluded that evidence of multiple acts was presented on each of the four charges against King, we turn to whether the "State . . . inform[ed] the jury which act to rely upon in its deliberations or the court . . . instruct[ed] the jury to agree on the specific criminal act. The failure to elect or instruct is error." *Voyles*, 284 Kan. 239, Syl. ¶ 2. There is no indication in the record before us that the State informed the jury which act to rely upon for any of the charges against King. And the parties agree that King did not request and the district judge did not provide *sua sponte* a jury instruction on unanimity for any of the charges. Thus there was a multiple acts error on each charge.

"When a unanimity instruction was not requested or given and no general denial was presented by the defendant, an appellate court may conclude that the failure to instruct the jury to agree on a specific criminal act warrants reversal under the clearly erroneous standard." *Voyles*, 284 Kan. 239, Syl. ¶ 4. "If there is no unified defense, we do not tolerate verdict uncertainty in these cases." 284 Kan. at 253. And, even if the defendant has made a general denial, "error may be reversible when the trial is not *merely* a credibility contest between the victim and the defendant." (Emphasis added.) 284 Kan. 239, Syl. ¶ 5. Inconsistent testimony from a victim, for example, can mean reversal is necessary. 284 Kan. 239, Syl. ¶ 5; see [*Kameron*] *King*, 297 Kan. at 983 ("presentation of a unified defense or a general denial does not foreclose reversible error in a multiple acts case"). "[W]hen other evidence presents inconsis-

tencies that distinguish between two or more incidents," a review of the entire record is appropriate "to determine if [the appellate court] is firmly convinced that the jury would have reached a different verdict had the error not occurred," *i.e.*, whether there was clear error. 297 Kan. at 983-84.

The parties disagree on whether King's defense can be characterized as a general denial. On this point, we agree with King that his defense was not "merely" a general denial. As he states in his brief, "when the defense puts on different evidence to defend different dates of alleged occurrences, it is not a unified defense."

The State's evidence also complicated the jury's task beyond picking the winner in a pure credibility contest. It proved up "a number of factually separate incidents . . . from which the jury could have found" King guilty of the charged crimes. See *Voyles*, 284 Kan. at 253. The evidence showed that King usually was at work when the children were home and awake, and that the children spent most weekends and school holidays away from King's home. The State thus focused on opportunity to commit the crimes, and it specifically sponsored evidence of 11 discrete dates when King would have been alone with the children. In response, King marshaled exculpatory evidence aimed at particular days among the 11. In short, the State put on evidence of unique timing of several incidents, and King advanced a general denial *plus* designed to meet the unique timing proof.

This court has said that

"youthful victims reporting incidents, giving statements, and testifying cannot provide mathematical certainty about events. We also acknowledge, however, the substantial prejudice to a defendant when the equivalent of evidence of propensity to commit crime—more multiple acts than charges, without an election or instruction—is placed before a jury." 284 Kan. at 255.

In this case, we cannot ignore or minimize the prejudice to defendant King from the court's failure to instruct on unanimity and the State's failure to elect which of the multiple acts underlying each of King's charges was to be relied upon by the jury. We have no confidence in the reliability of the guilty verdicts, and we reverse all of King's convictions and remand the case for further proceedings.

## K.S.A. 2013 Supp. 60-455 Evidence on Allegations for Which King Was Acquitted

This court's review of the admission of evidence involves a multistep analysis:

"[T]he first question is relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. See *State v. Reid,* 286 Kan. 494, 507-09, 186 P.3d 713 (2008). The second step is to determine which rules of evidence or other legal principles apply. On appeal, this conclusion is reviewed de novo. *Boldridge v. State,* 289 Kan. 618, Syl. ¶ 10, 215 P.3d 585 (2009). In the third step of the analysis, a district court must apply the applicable rule or principle. The appellate court's standard of review of this third step varies depending on the rule or principle that is being applied. Some rules and principles grant the district court discretion, while others raise matters of law. *State v. Riojas,* 288 Kan. 379, 383, 204 P.3d 578 (2009). Finally, an analysis under K.S.A. 60-445 may be required, depending on the issue and parties' arguments. Under that statute, a district judge 'may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence will be offered.' This analysis is reviewed under an abuse of discretion standard. See *Reid,* 286 Kan. at 509." *State v. Shadden,* 290 Kan. 803, 817-18, 235 P.3d 436 (2010).

Before trial, the State sought permission to admit K.S.A. 2013 Supp. 60-455 evidence that King had sexually abused another young girl, J.B. King had been acquitted in a prosecution arising out of J.B.'s past allegations of abuse. The State argued that the evidence was relevant to show a plan or modus operandi because the facts underlying those allegations were strikingly similar to the facts of this case. See *State v. Prine,* 297 Kan. 460, 480, 303 P.3d 662 (2013) (confirming "strikingly similar" standard for admission of plan evidence under 60-455).

The record before us demonstrates that the State appreciated the governing statute had recently been amended to permit admission of other crimes and civil wrongs evidence in cases of sexual misconduct "on any matter to which [the evidence] is relevant and probative." See K.S.A. 2013 Supp. 60-455(d). The amendment meant that the State could have argued with success that subsection (d) permitted it to introduce the evidence to demonstrate

King's propensity to commit sex crimes against young girls. See *Prine*, 297 Kan. at 479. But the State did not do so.

In *Prine*, even though the evidence in question had been admitted erroneously to show intent, absence of mistake or accident, and plan, we determined that the error was harmless under K.S.A. 60-261 because the prosecution would be free to introduce the same evidence on retrial to prove propensity. 297 Kan. at 479-81. But for one additional consideration, we expect the same would be true here, that is, even if J.B.'s earlier allegations against King were admitted erroneously to show plan or modus operandi, they probably could come into evidence on any retrial under the new subsection (d) of K.S.A. 2013 Supp. 60-455.

The one additional consideration for the district judge on remand is that King was acquitted in the case arising out of J.B.'s allegations. This consideration deserves more attention and a more thorough analysis on any retrial than it received the first time around.

Our older cases examining the effect of an earlier acquittal on admissibility of underlying evidence in a later prosecution on new charges have turned on applicability of the doctrine of collateral estoppel. See *State v. Searles*, 246 Kan. 567, 579-82, 793 P.2d 724 (1990); *State v. Irons*, 230 Kan. 138, 140-45, 630 P.2d 1116 (1981); *State v. Darling*, 197 Kan. 471, 478-81, 419 P.2d 836 (1966).

In *Irons*, this court addressed whether an acquittal precludes the State from introducing evidence of the charged conduct as a prior bad act in a subsequent proceeding:

"[W]hen an application is made to admit evidence of a prior offense of which defendant has been acquitted, an additional consideration presents itself—the possibility of collateral estoppel.

"When an issue of ultimate fact has once been determined by a valid and final verdict or judgment that issue cannot again be litigated between the same parties in any future lawsuit under the rule of collateral estoppel. [Citations omitted.]

"The rule of collateral estoppel in criminal cases is not to be applied with a hypertechnical approach, but with realism and rationality. Where a previous judgment of acquittal is based upon a general verdict this approach requires a court to examine the record of the prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter, and if the court concludes a rational jury would have had to base its verdict of acquittal on the same issue which the

State seeks to prove by introducing evidence of a prior offense then collateral estoppel applies. [Citations omitted.]" *Irons*, 230 Kan. at 143-44.

In *Irons*, the defendant had been previously tried and acquitted of robbery. The evidence in both cases led to a reasonable inference that both crimes had been committed by the same person. 230 Kan. at 144. This court held that in the first case the defendant's identity had been in issue and he was acquitted; therefore, "[t]he issue of defendant's participation in that case was settled," and collateral estoppel protected him from having to retry the prior offense. 230 Kan. at 144.

The *Irons* court distinguished the case before it from other cases in which evidence introduced at trial leading to an earlier acquittal had been held admissible. 230 Kan. at 142-44; see *Darling*, 197 Kan. at 480-81 (evidence defendant previously performed procedure resulting in abortion; despite acquittal, evidence admissible to show same procedure performed knowingly, with intent to commit abortion); *Oliphant v. Koehler*, 594 F.2d 547, 554-55 (6th Cir. 1979) (evidence of prior offenses admissible where issue in prior rape trials was consent and evidence in current trial presented to show plan).

We addressed collateral estoppel in this context again in *Searles*. Before trial, the district court ruled that the issue in Searles' acquittal was consent, while in the current case it was identity. Because the district court determined that the evidence was being presented for a different issue in each case, this court found no error in admitting the evidence in the second trial. 246 Kan. at 581-82.

Should this case be retried, and should the State again seek to introduce evidence of J.B.'s past allegations against King, the district judge will have to analyze whether the prosecution in which King was acquitted had at its heart the same issue or issues to be entrusted to the second jury in this case. If so, collateral estoppel should prevent introduction of the evidence. If not, collateral estoppel will pose no obstacle to introduction of the evidence under K.S.A. 2013 Supp. 60-455(d).

## APPLICATION OF THE RAPE SHIELD STATUTE

The other evidentiary issue that warrants discussion before remand is the admissibility of R.B.'s sexual abuse allegations against the two juveniles. On appeal, King argues that admission of the evidence was imperative because it provided an alternate explanation for the symptoms and behaviors R.B. exhibited, including "her ability to talk about sexual details."

K.S.A. 21-3525, which limits evidence of a sex crime victim's previous sexual conduct with any person including the defendant, is known as the rape shield statute. It is designed to protect such victims from unnecessary intrusion into their private lives and reads in pertinent part:

"(b) Except as provided in subsection (c), in any prosecution to which this section applies, evidence of the complaining witness' previous sexual conduct with any person including the defendant shall not be admissible, and no reference shall be made thereto in any proceeding before the court, except under the following conditions: The defendant shall make a written motion to the court to admit evidence or testimony concerning the previous sexual conduct of the complaining witness. . . . The motion shall state the nature of such evidence or testimony and its relevancy and shall be accompanied by an affidavit in which an offer of proof of the previous sexual conduct of the complaining witness is stated. . . . The defendant, defendant's counsel and prosecutor shall be prohibited from disclosing any matters relating to the motion, affidavits and any supporting or responding documents of the motion. The court shall conduct a hearing on the motion in camera. At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the previous sexual conduct of the complaining witness is relevant and is not otherwise inadmissible as evidence, the court may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted. The defendant may then offer evidence and question witnesses in accordance with the order of the court." K.S.A. 21-3525(b).

The key consideration under the statute is relevance. See K.S.A. 21-3525(a), (b).

"There are two elements of relevance: materiality and probative value. [Citations omitted.] In analyzing whether evidence is material, the focus is on whether the fact sought to be proved has a legitimate and effective bearing on the decision of the case and is in dispute. [Citation omitted.] Evidence is probative if it has ' "any tendency in reason to prove" ' a material fact. [Citation omitted.] The materiality of evidence is reviewed de novo, and the existence of probative value is reviewed

under an abuse of discretion standard. [Citation omitted.]" *State v. Wells*, 297 Kan. 741, 759, 305 P.3d 568 (2013).

See also *State v. Gilliland*, 294 Kan. 519, 540, 276 P.3d 165 (2012), *cert. denied* 133 S. Ct. 1274 (2013) (relevance key consideration when applying rape shield statute).

We need not decide today whether the district judge's exclusion of the evidence in the first trial was an abuse of discretion. We merely note that, on remand, it is possible that more information about the nature of the allegations and why they did not lead to a prosecution may be available. The district judge's expressed concern about vagueness may evaporate. Assuming that issue is put to rest, R.B.'s earlier allegations may meet the relevance threshold of the statute to the extent Rasmussen again opines that R.B.'s dissociation may be related to a traumatic event or the State again argues that R.B. had no way of knowing what she did about sex absent King's abuse. See *State v. Holman*, 295 Kan. 116, 139, 284 P.3d 251 (2012) (prior sexual conduct evidence may be material if relevant to identity of rapist, consent of complaining witness, whether defendant had intercourse with complaining witness); *State v. Berriozabal*, 291 Kan. 568, 587, 243 P.3d 352 (2010) (evidence that could explain healed vaginal tear material in sex crime prosecution).

## CONSIDERATION OF DEPARTURE

Finally, we briefly address the defense argument on appeal that the district judge erred as a matter of law in denying King's departure motion. We do so to ensure that any sentencing that occurs on remand avoids such error.

In response to the motion for departure, the district judge stated: "[T]he legislature has precluded the Court from consideration of any mitigating factors or, as the State pointed—attempted to point out, aggravating factors." He also said that, unless Jessica's Law was unconstitutional, he was "precluded from even considering your arguments . . . today to mitigate or to lessen the sentence. The law is quite clear. The Court has no authority to deviate from that."

Subsection (d) of Jessica's Law, K.S.A. 21-4643, explicitly permits departures in certain circumstances:

"On or after July 1, 2006, for a first time conviction of an offense listed in paragraph (a)(1), the sentencing judge shall impose the mandatory minimum term of imprisonment provided by subsection (a), unless the judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure. If the sentencing judge departs from such mandatory minimum term of imprisonment, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure."

Before his conviction in this case, King had no prior criminal history. Thus the district judge was not "precluded" from considering a departure. See *State v. Jolly*, 291 Kan. 842, 846, 249 P.3d 421 (2011).

## CONCLUSION

Because multiple acts error infects each of defendant King's convictions and undermines this court's confidence in the jury's decisions, this case is reversed and remanded to the district court for further proceedings.