NOT DESIGNATED FOR PUBLICATION

No. 126,430

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ABRON DION SLAUGHTER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Oral argument held October 16, 2024. Opinion filed November 22, 2024. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Kendall Kaut*, assistant district attorney, *Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and HILL, JJ.

PER CURIAM:  Abron Dion Slaughter appeals his convictions for aggravated battery, criminal threat, and criminal restraint. He contends:  (1) the district court committed clear error in failing to instruct the jury on the lesser included offense of simple domestic battery; (2) the district court committed clear error by failing to give a unanimity instruction; (3) the district court committed clear error by giving an instruction on the required culpable mental state that diluted the required elements of the offense; (4) the district court erred by failing to give a limiting instruction after the complaining

1

witness testified about prior bad acts; and (5) he was deprived of a fair trial by cumulative error. Because we fail to find a reversible error, we affirm the district court.

FACTUAL AND PROCEDURAL HISTORY

In 2016, Slaughter became involved in a romantic relationship with R.S. During the next three years, the relationship was on-and-off, and Slaughter and the victim lived together until the end of 2018.

On December 15, 2019, at around 9 a.m., R.S. heard a knock at her front door and, at that same time, she received a phone call from Slaughter asking to be let inside. R.S. testified that she did not invite Slaughter over. She did not want him to come over unannounced.

R.S. opened the door and allowed Slaughter inside. Slaughter, who smelled of the odor of alcohol, walked to R.S.'s bedroom and laid down on the bed. R.S. gathered the documents that she would work on that day, went into the dining area, and made coffee.

R.S. eventually called out to Slaughter, asking to speak with him, and Slaughter entered the living room where R.S. was working. R.S. told him she would appreciate it if he would call and let her know he was coming because she had other things to do and did not like that he showed up unannounced. Slaughter responded:  "[B]itch, I can come over here anytime I want to. Bitch, I don't need your permission to come over here. I can do what I want to do."

R.S. testified that Slaughter then slapped her coffee off the table and lunged at her. Slaughter began "punching" and "choking" R.S. R.S. said she believed Slaughter used both an open hand and a closed fist as he punched her face. R.S. testified she could not

2

remember what Slaughter was saying to her. R.S. said she was screaming: "[S]omebody please help me."

During the struggle, Slaughter got R.S. on the ground and grabbed her hair. She testified that she remembered "being on my front side and he had ahold of my hair and he was pushing my face into my chest where I couldn't breathe." At one point, R.S. remembered being face down. She testified that Slaughter "had my hair entangled in his fists and he was, like, pushing my head into my chest as hard as he could, and it was in the right corner of the dining room by the wall by this glass table." R.S. testified that it was at the point in time that Slaughter was pushing her head to her chest and she could not breathe that she began "kicking the wall hoping that one of the neighbors would hear me and call the police."

R.S. testified that Slaughter was positioned above her, leaning into her, and his hand was around her throat. Slaughter was squeezing her throat to the point that she could not breathe. R.S. testified that she thought she would die, and she was praying that she would not die. Slaughter told R.S.: "[B]itch, I will kill you." R.S. said she could not speak while she was being choked. R.S. testified that she may have lost consciousness, but she was not sure.

Slaughter then grabbed R.S. by the hair and led her into the bedroom. R.S. said that Slaughter had her hair entangled in his fists and turned her hair to guide her and lead her into the bedroom. R.S. pleaded with Slaughter to let go of her hair, but he held onto her hair for 10 or 15 minutes. R.S. grabbed the door frame of the bedroom and asked Slaughter to let go of her hair. R.S. told Slaughter that she would go with him anywhere if he would just let go, but he did not let go of her hair.

When they entered the bedroom, Slaughter told R.S. to remove her robe. Apparently during the altercation, R.S. had defecated on her robe. Slaughter told her:

3

"[L]ook at you, stupid bitch, you shit on yourself." Slaughter then began to clean R.S.'s wounds with a washcloth, and he used a Q-tip to clean the blood from her nose.

R.S.'s neighbor, Jacob Patterson, testified that he was in the kitchen of his apartment with his wife when he heard thumping on the conjoined wall between their apartments. Patterson testified:

> "And as the thumping continued, we could hear what seemed to be a woman's voice screaming, stop, stop, stop, stop it. And as the thumping continued, we heard, I think he is going to kill me. Oh, my God. I think he is going to kill me. And then more screaming continued."

In response to R.S.'s call for help, Patterson called 911. When the officers arrived, they knocked on the door of the adjoining apartment. The officers did not hear anything at first, but then a person with a male voice said it was not his apartment so he could not open the door. Eventually, R.S. opened the door. The officers separated R.S. and Slaughter.

After he was separated from R.S., Slaughter told officers that he "got mad and flipped over a couple of tables," but that was the only thing that he did.

Patterson testified that after the incident R.S. approached him and thanked him for calling 911. R.S. told him that she believed Patterson saved her life that day by calling 911. He said she seemed very distraught and gave him a hug before she left.

On December 16, 2019, the State charged Slaughter with aggravated domestic battery, criminal threat, criminal restraint, and criminal damage to property.

4

During a two-day jury trial, R.S. testified regarding her injuries, noting that she had swelling and bruising to her head and face as well as a cut above her lip. R.S. said she also had some cuts on her neck and bruises on her body. The State presented six photographs of R.S.'s injuries at trial. Exhibits 2 through 4 show the broken blood vessels in R.S.'s eyes. Exhibit 6 show marks and redness on R.S.'s neck and an abrasion on her neck and collarbone.

Officer Alexander Carroll, one of the officers who was dispatched to R.S.'s apartment after the neighbor called 911, testified that when he arrived at the scene, the apartment was in disarray. A glass table in the living room was flipped on its side, an end table was also flipped on its side, and a coffee cup was on the floor. Carroll saw a puddle of coffee on the leather footstool and coffee splattered on books and papers on the floor. In addition, there was a broken antique bowl on the floor. R.S. told Carroll the bowl was broken during her argument with Slaughter.

Officer Carroll testified that when he was speaking with R.S., he observed that her face was "very swollen," and her right eye was swelling up and starting to bruise. Carroll also noticed her nose was swollen with fresh blood coming from her nostrils, and R.S.'s lips had several cuts on them. Carroll testified that petechial hemorrhaging was present on both of her eyelids, which he testified is present when oxygen to the blood vessels of the eyes gets cut off. Caroll also noticed injuries to R.S.'s neck, stating that it was red and starting to bruise. With her permission, he felt R.S.'s right shoulder, which had a large knot on the back of it that he was not able to document because it could not be visually seen.

During jury deliberations, the jury asked whether the charge of criminal threat was based on Slaughter's threat to kill R.S. or whether it could also consider "a physical or nonverbal threat." The jury was referred to the jury instructions.

5

The jury convicted Slaughter of aggravated domestic battery, criminal threat, and criminal restraint, but the jury acquitted him of criminal damage to property. The district court sentenced Slaughter to 29 months in prison followed by 12 months of postrelease supervision. Slaughter filed a timely notice of appeal.

ANALYSIS

For the first time on appeal, Slaughter alleges four instructional errors for instructions he did not request.

This court may review instructional issues for the first time on appeal. K.S.A. 22-3414(3); *State v. McLinn*, 307 Kan. 307, 317-18, 409 P.3d 1 (2018). But when a party fails to object to a jury instruction before the district court, an appellate court reviews the instruction to determine whether it was clearly erroneous. K.S.A. 22-3414(3). For a jury instruction to be clearly erroneous, the instruction must be legally or factually inappropriate and the court must be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

We will review each alleged failure using this standard.

I.      Failure to instruct the jury on the lesser included offense of simple domestic battery was not clear error.

Slaughter argues for the first time on appeal that the district court should have provided a lesser included offense instruction to the jury, giving it the option of convicting Slaughter of simple domestic battery under K.S.A. 21-5414(a)(2) instead of aggravated domestic battery under K.S.A. 21-5414(b)(1). Slaughter acknowledges he did

6

not request the lesser included offense instruction, but he claims failing to give the instruction amounts to clear error. Accordingly, Slaughter asks the court to reverse his conviction for aggravated domestic battery and remand the case for a new trial on that charge.

The State concedes that the lesser included offense was legally and factually appropriate. But the State claims failing to give the lesser included offense instruction in this case is not reversible under the clear error standard.

Accordingly, we will presume that the lesser included instruction was both legally and factually appropriate, so we focus on reversibility. See *State v. Salary*, 301 Kan. 586, 598-99, 343 P.3d 1165 (2015) (the court may assume instructional error and skip to the final step—reversibility). Under that standard, we reverse only if we are "firmly convinced based on the trial evidence that the jury would have reached a different verdict if such an instruction had been given." *State v. Berkstresser*, 316 Kan. 597, 598, 520 P.3d 718 (2022).

Here, the State charged Slaughter with aggravated battery, which required a showing that Slaughter "[k]nowingly imped[ed] the normal breathing or circulation of the blood" of the victim "by applying pressure on the throat, neck or chest" in a "rude, insulting or angry manner." K.S.A. 21-5414(b)(1). The State presented evidence that Slaughter put his hand around R.S.'s throat with enough pressure that she could not talk or breathe. In addition, the State presented evidence that Slaughter pushed R.S.'s head to her chest which also impeded her talking and breathing. R.S. testified that she could not breathe, and she was praying that she would not die. R.S. also testified that when Slaughter was above her and leaning into her, she could not speak. She testified that Slaughter was pushing her head into her chest as hard as he could, and she may have lost consciousness. In between the incidents of being unable to breathe, R.S. was calling out for help. The neighbor heard those cries for help and called 911. When police showed up,

7

they found an apartment in disarray with spilled coffee, overturned tables, and a broken antique bowl.

In an attempt to meet his burden of proof that he was prejudiced by failing to give a simple domestic battery instruction, Slaughter suggests that R.S. changed her testimony after receiving therapy. Yet he points to nothing in the record to support his position. R.S. testified Slaughter impeded her breathing by putting his hand around her neck and then impeded her breathing when he pushed her head to her chest. Slaughter does not point to anything in the record showing that R.S. backed away from her description of the physical altercation. Slaughter does point to some conflicting evidence in the record that R.S. told the officers that her breathing was constricted only when Slaughter "pushed" her head "to her chest." In addition, he points to evidence that the officer who observed petechial hemorrhaging as evidence of strangulation was not a physician who could diagnose the condition or provide any expert opinion about its significance. During cross-examination, Slaughter challenged the officer's opinion about those injuries and the jury heard the officer's testimony that he was not a doctor who could diagnose petechial hemorrhaging, so the jury was able to consider Slaughter's challenge to the evidence.

Slaughter contends that considering R.S.'s "conflicting statements" about whether she could breathe at various points of the altercation and in the "absence of corroborating evidence and/or medical testimony that would show strangulation," the jury members may have formed reasonable doubt about whether Slaughter impeded R.S.'s breathing.

R.S.'s testimony about Slaughter's actions was explicit and consistent. She claimed Slaughter choked her with his hand, and he pushed her head down to her chest. R.S. consistently testified at trial that her breathing was impeded during both incidents. The State presented photographs of R.S.'s injuries documenting the broken blood vessels in her eyes. The photographs also showed marks and redness on her neck and an abrasion on her neck and collarbone. Officer Carroll testified that petechial hemorrhaging was

8

present on both of R.S.'s eyelids, which he testified happens when oxygen to the blood vessels of the eyes gets cut off. In addition, Caroll testified that R.S.'s neck was red and starting to bruise. R.S.'s neighbor heard her cries for help and called 911. R.S.'s testimony and the corroborating evidence point to a conviction under K.S.A. 21-5414(b)(1) rather than the lesser crime under K.S.A. 21-5414(a)(2) requiring mere physical contact in a rude, insulting, or angry manner.

Slaughter has the burden to show the necessary prejudice, and reversal of his conviction is not required unless he can establish that there has been clear error. See *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023). Considering the evidence in the record, Slaughter has failed to firmly convince us that the jury would have reached a different verdict if the lesser included instruction of simple domestic battery had been given.

II.     Failure to give a jury unanimity instruction was not clear error.

Slaughter next argues that the district court committed clear error by failing to give a unanimity instruction. He concedes that he failed to object or request a unanimity instruction. So he bears the burden of establishing clear error. Reversal is required only if an instruction error occurred, and the panel is firmly convinced that the giving of the instruction would have changed the verdict. K.S.A. 22-3414(3); *Bentley*, 317 Kan. at 242.

Slaughter argues that the State presented evidence of two legally separate acts of impeding R.S.'s breathing. With two acts presented in R.S.'s testimony, Slaughter argues the district court committed clear error by failing to give a unanimity instruction.

The State responds that the two acts that Slaughter claims were presented as separate acts occurred in "rapid succession." Because the acts did not occur at different times or in different locations, and the acts were not the result of a fresh impulse, there

9

were no multiple acts that would have necessitated a unanimity instruction. In other words, there was no error at all. In the alternative, the State claims that Slaughter fails to show that if there was error it would require his conviction be reversed.

Under Kansas law, a defendant is entitled to a unanimous jury verdict. K.S.A. 22-3421; K.S.A. 22-3423(1)(d); *State v. Brown*, 298 Kan. 1040, 1055, 318 P.3d 1005 (2014). In a case of multiple acts, where any one act could constitute the crime charged, the jury must be unanimous in finding which specific act constitutes the crime. See *State v. Akins*, 298 Kan. 592, 618, 315 P.3d 868 (2014); *State v. De La Torre*, 300 Kan. 591, 595, 331 P.3d 815 (2014). Therefore, to ensure jury unanimity in multiple acts cases, at least one of two things should happen: (1) the State must elect which act it is relying on for the charge; or (2) the district court must instruct the jury that it must unanimously agree on the specific act constituting the crime charged. *Akins*, 298 Kan. at 618; *De La Torre*, 300 Kan. at 596.

An appellate court follows a three-part test when analyzing a multiple acts case. 300 Kan. at 596. First, the court determines whether this is a multiple acts case, with the threshold question being "whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime." 300 Kan. at 596 (citing *State v. King*, 299 Kan. 372, Syl. ¶ 1, 323 P.3d 1277 [2014]). This is a question over which this court exercises unlimited review. *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014). If the court finds the case is not a multiple acts case, the analysis ends. See *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007). If the court decides that multiple acts were involved, the second step involves deciding whether error was committed either because the district court failed to instruct the jury to agree on the specific act for each charge or because the State failed to tell the jury which act to rely on in its deliberations. *State v. King*, 297 Kan. 955, 979, 305 P.3d 641 (2013). Finally, if error was found, this court evaluates any error for harmless error. 297 Kan. at 979-80.

Slaughter was charged with one count of aggravated domestic battery under K.S.A. 21-5414(b)(1). "[M]ultiple acts" are legally and factually separate incidents that independently satisfy the elements of the charged offense. *State v. Soto*, 299 Kan. 102, 111, 322 P.3d 334 (2014). The State presented evidence that Slaughter impeded R.S.'s breathing by placing his hand on her neck and by pushing her head down to her chest. Slaughter argues that this single charge encompasses multiple acts because some jurors could have based his conviction on placing his hand around R.S.'s neck, while other jurors could have based his conviction on pushing her head down to her chest.

When a case involves multiple acts, the jury must be unanimous in finding which specific act it relied on to convict the defendant of a crime. Thus, the district court must give the jury a unanimity instruction or the State should elect which act it is relying on for the conviction. *King*, 297 Kan. at 977-78. Whether a case presents multiple acts is a question of law over which this court has unlimited review. 297 Kan. at 981. If the acts are not legally or factually separate, then they do not constitute multiple acts. 297 Kan. at 980.

Four factors help the court determine whether there are multiple acts: "'(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there was a fresh impulse motiving some of the conduct.' *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 (2006)." *King*, 297 Kan. at 981.

As discussed above, instruction No. 10 provided the jury with the elements of aggravated domestic battery, which required a showing that Slaughter "knowingly impeded the normal breathing or circulation of the blood" of the victim "by applying pressure on her throat, neck, or chest" in a "rude, insulting, or angry manner." See K.S.A. 21-5414(b)(1). R.S. testified that her breathing was impeded during the altercation when

11

Slaughter put his hand around her neck and when he pushed her head down to her chest. The acts occurred close in time, but there was no break in the altercation between these two acts, no intervening event, and no evidence of a fresh impulse. These acts occurred in the same room as R.S. was lying between the wall and the overturned glass table. There was no break between the two alleged acts of strangulation.

We find that there were not multiple acts in this case. If the State had charged Slaughter with two acts of aggravated domestic battery, the evidence would not support a conviction for two separate acts. Under the factors set forth in *King*, Slaughter has failed to show there were two multiple acts requiring a unanimity instruction.

But Slaughter notes that rather than electing which act supported the charge or providing the jury with a unanimity instruction, the State complicated the issue during closing argument by talking about the strangulation as two acts. In closing argument, the State asserted:

> "Let's talk a little about the first element of aggravated domestic battery. The first element is the defendant knowingly impeded the normal breathing or circulation of the blood of [R.S.] by applying pressure on her throat, neck or chest. You heard testimony from [R.S.] about two separate incidents on December 15th. She told you he put his hand on her throat and squeezed. And she told you she felt like she was going to die and couldn't breathe or even scream for help. She also told you he pushed her head towards her chest during this same attack, again making it difficult for her to breathe.
> "That is impeding the normal breathing or circulation of blood. She testified about both of those instances impeding her ability to breathe. But even if you only consider what she told Officer Carroll on the body cam on December 15th, she described the defendant pushing her head towards her chest, causing her to be unable to breathe."

So rather than electing an act, the State may have confused the jury by talking about the strangulation as two incidents. To avoid error, Slaughter claims the State should

12

have clarified that the strangulation was all one act; or in the alternative, either the State should have elected one of the acts to rely on or the district court should have given a unanimity instruction. Even though under the facts analyzed above it appears that Slaughter's strangulation of R.S. was all one act, we agree that the State may have confused the jury by talking about two acts as separate incidents. Even so, we have de novo review over whether the strangulation in this case constituted one act or two. *King*, 299 Kan. at 379. Despite the State's closing argument, we must examine these facts. And the facts support a finding that there were not multiple acts but an act of strangulation during one continuous physical altercation.

But even if error is found, the final step is to determine whether the error is reversible error. *King*, 297 Kan. at 982. To find the error requires reversal, this court must be firmly convinced that the jury would have reached a different verdict had the instruction been given. Slaughter must establish the degree of prejudice necessary for reversal. K.S.A. 22-3414(3); *Bentley*, 317 Kan. at 242.

In this case, Slaughter has failed to show prejudice requiring reversal. The evidence supporting the choking with the hand and the choking by pushing her head down was essentially the same. R.S. testified that both acts occurred during the physical altercation in her living room, and her breathing was impeded during both acts. The acts occurred in the same room, at the same time, and there is not much by which the jury could have distinguished the acts. Slaughter argues that the acts were separate because R.S. was able to call out for help between the two acts. And he notes that the jury had to find a culpable mental state—that Slaughter committed the act knowingly—and this finding might have been different for the act of the hand around her neck and pushing her head to her chest. Yet R.S. testified that he grabbed her by the throat and squeezed. And she testified that "[h]e had my hair entangled in his fists and he was . . . pushing my head into my chest as hard as he could." R.S. claimed she may have lost consciousness.

13

These acts occurred at the same time and with force. The evidence does not show there was a break or fresh impulse between the acts. With almost no distinction between the two acts that occurred almost simultaneously during the same physical altercation, it is difficult to be firmly convinced that the jury would have reached a different verdict but for the error. Thus, Slaughter has not shown that the alleged error amounts to reversible error.

III.    The State did not dilute the culpable mental state for the crimes.

Slaughter claims the district court's jury instruction on the required culpable mental state for both aggravated domestic battery (jury instruction Nos. 10 and 11) and criminal restraint (jury instruction Nos. 14 and 15) diluted the required elements of the charged offenses. As with the previous claims of error, he concedes that he did not object to the instructions as given or request any additional instructions on the culpable mental states for the crimes of aggravated domestic battery and criminal restraint. And also as with his previous claims, he bears the burden to show there was error that requires reversal.

In response, the State claims that the district court instructed the jury as set forth in PIK Crim. 4th 52.010 (2021 Supp.), and the instruction was legally and factually appropriate. In the alternative, the State claims any error was not clearly erroneous.

a. *The instruction given was not legally appropriate.*

In instructing the jury on the crimes of aggravated domestic battery and criminal restraint, the district court provided the elements of the crimes to the jury and then instructed the jury that the State had to prove that Slaughter committed the respective offenses knowingly. The district court then instructed the jury as follows:  "A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State

14

complains about. OR of the circumstances in which he was acting, OR that his conduct was reasonably certain to cause the result complained about by the State." Slaughter complains that the instruction was legally inappropriate because the district court failed to make it clear that the culpable mental state applied to all the elements of each offense.

Kansas law requires a culpable mental state as an essential element of every crime which must be established by proof that the accused committed the conduct intentionally, knowingly, or recklessly. K.S.A. 21-5202(a). The culpable mental states are classified by relative degree, with intentionally being the most serious, followed by knowingly, and then recklessly. K.S.A. 21-5202(b). Here Slaughter does not dispute that knowingly was the requisite mental state for both crimes, and the jury was instructed regarding that culpable mental state.

This court's review regarding whether an instruction is legally and factually appropriate is unlimited. *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016). For a jury instruction to be legally appropriate, it "must fairly and accurately state the applicable law." *State v. Wimbley*, 313 Kan. 1029, 1034, 493 P.3d 951 (2021). In determining whether an instruction was factually appropriate, the court must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. *State v. Holley*, 313 Kan. 249, 255, 485 P.3d 614 (2021).

Slaughter argues that the culpable mental state applies to both the action and the result. Whether a culpable mental state applies to each element of a crime or only to a specific element is set forth in K.S.A. 21-5202(f) and (g). K.S.A. 21-5202(f) states that if a criminal statute prescribes a culpable mental state "without distinguishing among the material elements thereof," then the mental state applies to all the material elements "unless a contrary purpose plainly appears." Yet if the statute prescribes a culpable

15

mental state for only a specified element, then a culpable mental state is not required for any other element "unless otherwise provided." K.S.A. 21-5202(g).

As charged, aggravated domestic battery is "[k]nowingly impeding the normal breathing or circulation of the blood by applying pressure on the throat, neck or chest of a person with whom the offender is involved or has been involved in a dating relationship . . . when done in a rude, insulting or angry manner." K.S.A. 21-5414(b)(1). The statute includes the elements related to conduct, attendant circumstances, and the result of the action. Slaughter argues that K.S.A. 21-5202(f) requires that the State prove that Slaughter had a knowing mental state for each of the material elements of the charged offense.

Criminal restraint requires "knowingly and without legal authority restraining another person so as to interfere substantially with such person's liberty." K.S.A. 21-5411(a). The elements in this statute include the act of restraining another person and the result of substantially interfering with that person's liberty. Slaughter again argues that because the statute sets out a knowing culpable mental statute without distinguishing between the essential elements, the State was required to prove the knowing mental statute as applied to each of the elements.

The district court provided the jury with a definition of knowingly that is consistent with PIK Crim. 4th 52.010. In addition, in K.S.A. 21-5202(i), the Legislature provided that the culpable state of knowingly should be applied to both the nature of a person's conduct and the result of a person's conduct. K.S.A. 21-5202(i) states: "[W]ith respect to the nature of such person's conduct" a person acts "'knowingly'" or "'with knowledge'" "when such person is aware of the nature of such person's conduct or that the circumstances exist." And a person acts "'knowingly'" or "'with knowledge'" with respect to a result of such person's conduct "when such person is aware that such person's conduct is reasonably certain to cause the result." K.S.A. 21-5202(i). Appellate courts

16

consider jury instructions as a whole, without focusing on any single instruction in isolation, to determine whether they properly and fairly state the applicable law or if it is reasonable to conclude that they could have misled the jury. *State v. Buck-Schrag*, 312 Kan. 540, 553, 477 P.3d 1013 (2020).

Slaughter complains that the jury instruction defining knowingly was also stated in the disjunctive, providing that a defendant acts knowingly when the defendant is aware of the nature of his conduct *or* of the circumstances in which he was acting *or* that his conduct was reasonably certain to cause the result complained of by the State. Slaughter contends that this instruction allowed the jury to convict based on a finding that Slaughter had the culpable mental state for either the conduct or the result. Slaughter claims this instruction thus diluted the essential elements of the charged crimes of aggravated domestic battery and criminal restraint and was therefore legally inappropriate.

In support of his argument that the district court should have clarified that the culpable mental state applied to all elements, Slaughter cites *State v. Hobbs*, 301 Kan. 203, 210, 340 P.3d 1179 (2015), in which the Kansas Supreme Court reviewed a challenge to the sufficiency of the evidence of an aggravated battery conviction. Because the Legislature had prescribed that the mental state would apply to all elements of the crime under K.S.A. 21-5202(f), the court found that the State was required to prove not only that the defendant knowingly acted but also that the defendant had been "aware that his or her conduct was reasonably certain to cause the result." 301 Kan. at 211. And in *State v. Thomas*, 311 Kan. 905, 908-09, 468 P.3d 323 (2020), the court relied on *Hobbs* in holding that the district court erred in instructing the jury that aggravated battery required only the intent to engage in the underlying conduct that resulted in bodily harm. The Kansas Supreme Court found that the district court compounded the error by instructing the jury on all three alternative definitions of "'knowingly'" because those alternatives allowed the jury to convict the defendant without finding that he was aware his conduct was reasonably certain to cause great bodily harm. 311 Kan. at 908.

17

The instruction given in this case adhered to PIK Crim. 4th 52.010 and K.S.A. 21-5202(i). The Kansas Supreme Court ""strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions."' *State v. Butler*, 307 Kan. 831, 847, 416 P.3d 116 (2018). But similar to *Thomas*, the district court appeared to give alternatives to the jury by using "or" when defining the three alternative definitions of knowingly. For both charges, Slaughter claims that the jury instructions were unclear that the definition of knowingly applied both to the act and the result of that act. Slaughter persuasively argues that this constituted error because the jury instructions did not clearly instruct the jury that the culpable mental state applied to each element of the crimes of aggravated domestic battery and criminal restraint. Because the district court instructed the jury on all three alternative definitions of knowingly in the disjunctive, the jury instructions were not clear that the culpable mental state applied to each element of the criminal offenses.

b. *Slaughter fails to show that giving a different instruction would have changed the verdict.*

Even so, Slaughter has the formidable burden to show reversal is required because the jury instructions were clearly erroneous. To do so, the appellate court should be firmly convinced that the giving of a different instruction would have changed the verdict. K.S.A. 22-3414(3); *Bentley*, 317 Kan. at 242; see *Berkstresser*, 316 Kan. at 605-06 (clear error requires the appellate court to find that outcome "would" have been different, not just "'could'" have been different).

Slaughter argues that the evidence of aggravated domestic battery was far from overwhelming, and there is a reasonable possibility that one or more jurors would have formed reasonable doubt about whether Slaughter knew that he was restricting R.S.'s breathing by pushing her head to her chest. Slaughter claims maybe a member of the jury would have viewed his actions as reckless rather than knowing. Slaughter makes no

18

argument for how the jury instructions would have led to a different result for the crime of criminal restraint.

For aggravated domestic battery, the jury needed to find that the State proved that Slaughter knowingly committed the act of strangulation—performed in a rude, insulting, or angry manner—with the result that R.S.'s breathing or circulation of the blood was impeded. R.S. testified that Slaughter put his hand around her neck and forcefully pushed her head into her chest which resulted in a time that she was unable to breathe or talk. To get someone's attention, R.S. kicked the wall because she could not breathe or talk and as a result R.S.'s neighbor heard the thumping on the wall. R.S. testified that she was praying she would not die. R.S. testified that she might have lost consciousness during the physical altercation. Under these circumstances, the jury would not likely have found that Slaughter acted knowingly in one way, but not in another. When someone puts a hand around another's neck and applies force, it is likely they intended not only the action but also the result that the other's breathing would be impeded. The State presented ample evidence that Slaughter knowingly committed the action and knew the likely result of his action resulting in the crime of aggravated domestic battery.

For criminal restraint, the jury was instructed it must find that the State proved that Slaughter "knowingly and without legal authority restrained [R.S.] so as to interfere substantially with her liberty." The State introduced evidence that Slaughter held R.S. by her hair and impeded her ability to get away for 10 or 15 minutes. The State presented ample evidence that Slaughter knowingly committed the action and knew the likely result of his action resulting in the crime of criminal restraint.

Slaughter fails to show that the jury would have reached a different result had the jury instruction more clearly connected the action with the result and made clear that the culpable mental state applied to each element of the crimes. Even assuming the provided jury instructions were not legally appropriate, we do not find the errors were clearly

19

erroneous requiring reversal. The jury would not likely have reached a different result if the jury had been properly instructed.

IV.     A limiting instruction regarding prior bad acts was not necessary.

Slaughter claims the district court committed clear error by failing to give a limiting instruction after the complaining witness testified regarding prior alleged incidents of abuse. He claims failing to give the instruction was reversible because the State's case was based mainly on R.S.'s testimony and there was a real possibility that one or more jurors would have been influenced by the prior bad act evidence. In response, the State argues that a limiting instruction was not required because R.S.'s testimony regarding any prior bad acts was ambiguous. And failing to give a limiting instruction regarding her vague testimony did not amount to clear error.

Slaughter concedes that he did not request a limiting instruction or object to the district court's failure to include one in the jury instructions. If prior crimes evidence is admitted in a jury trial, a limiting instruction must be provided to tell the jury of the specific purpose for which the evidence was admitted. The Kansas Supreme Court has held that a defendant may challenge a district court's failure to give a limiting instruction regardless of whether they objected to the admission of the evidence that is the subject of the instruction. *State v. Breeden*, 297 Kan. 567, 582-83, 304 P.3d 660 (2013). When a jury instruction is not requested or objected to, Slaughter has the burden to show clear error. Again, under this standard, reversal is required only if an instruction error occurred, and the panel is firmly convinced that the giving of the instruction would have changed the verdict. K.S.A. 22-3414(3); *Bentley*, 317 Kan. at 242.

If prior crimes evidence is admitted in a jury trial, a limiting instruction must be provided to tell the jury of the specific purpose for which the evidence was admitted. *State v. Haygood*, 308 Kan. 1387, 1394, 430 P.3d 11 (2018). The purpose of the limiting

20

instruction is to eliminate the danger that the evidence will be considered to prove the defendant's propensity to commit the charged crime. *Breeden*, 297 Kan. at 582. Here, the district court did not rule on the admission of K.S.A. 60-455 evidence prior to or at trial. This court must first consider whether the evidence qualifies as generally prohibited evidence under K.S.A. 60-455 that would trigger the need for a limiting instruction. 297 Kan. at 581. Here, the district court did not consider the relevancy of the evidence nor weigh the probative value of the evidence against the prejudicial effect as would be required with the admission of K.S.A. 60-455 evidence. Rather, the alleged K.S.A. 60-455 evidence came during R.S.'s testimony, and Slaughter did not object to its admission.

During cross-examination, defense counsel began asking R.S. about the nature of her relationship with Slaughter:

"Q.   Would it be fair to assume that you would describe an on-and-off again relationship, that you had to not quite see each other eye-to-eye during your relationship?
"A.    No, he was beating on me. That is why."

There was no objection to R.S.'s testimony, and Slaughter is not challenging the admissibility of her statement on appeal. Even so, Slaughter claims the district court should have given a limiting instruction to consider the testimony only for the purpose of determining whether Slaughter and R.S. were in an on-and-off again relationship.

K.S.A. 2023 Supp. 60-455(a) provides: "[E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion."

21

The Kansas Supreme Court has focused on the clause "on a specified occasion" in K.S.A. 60-455 in finding that general testimony regarding prior crimes or civil wrongs does not require a limiting instruction. For example, in *State v. Sieg*, 315 Kan. 526, 532-33, 509 P.3d 535 (2022), our Supreme Court held that a limiting instruction was not required when the reference to prior crimes or civil wrongs was not specific. In that case, an officer testified that he believed the drugs found in the car belonged to the defendant in part because of "'*prior word of mouth of his behaviors and . . . his associations*.'" 315 Kan. at 532. The defendant complained that this testimony implied that because of his involvement in prior crimes, he was guilty of the charged crimes. In that case, the Court concluded that the testimony the defendant complained about "was too ambiguous to implicate K.S.A. 2020 Supp. 60-455(a)." 315 Kan. at 533; see *State v. Richmond*, 289 Kan. 419, 426-27, 212 P.3d 165 (2009) (holding that evidence that the defendant told a law enforcement officer that he did not sell drugs but instead "'robbed and killed people'" did not fall under K.S.A. 60-455 because it did not concern a crime or civil wrong which was committed "'on a specified occasion'").

In this case, R.S.'s testimony was vague and did not reference a crime or civil wrong that was committed on "a specified occasion" under K.S.A. 2021 Supp. 60-455(a). R.S.'s limited comment about "beating" did not reference a time or a place, and it was not specific enough to determine whether a prior crime occurred. Her testimony might have been a vague reference to previous physical altercations, but it was not evidence that Slaughter committed a specific crime on a specified occasion. As in *Sieg*, R.S.'s testimony was ambiguous and thus a limiting instruction was not required.

Even if a limiting instruction would have been appropriate, Slaughter has not shown the jury would have reached a different verdict had a limiting instruction been given. Slaughter argues that R.S.'s testimony was inconsistent and mostly uncorroborated. As discussed, his representation of R.S.'s testimony is not accurate. Her testimony was generally consistent, and her version of events was corroborated by

observations of the scene of the physical altercation, her neighbor's observations, and the observation and documentation of her physical injuries. In addition, the asserted prior crimes evidence was a statement made by R.S. herself. It is hard to imagine that because of her claim that her relationship was on-again and off-again because Slaughter "was beating on [her]," that the jury would have given more credibility to her testimony that he committed the alleged acts on December 15, 2019. The alleged K.S.A. 60-455 evidence came from the victim, and it was not corroborated by any other evidence or testimony. Slaughter does not show that failure to give a limiting instruction amounted to clear error.

V.      Cumulative error cannot be found when there was no error to aggregate.

Finally, Slaughter asserts that even if the district court's errors individually did not require reversal of his convictions, the cumulative errors require reversal of his convictions when considered collectively. In *State v. Waldschmidt*, 318 Kan. 633, 661, 546 P.3d 716 (2024), our Supreme Court held that if there is no finding of clear error on an unpreserved instructional issue, then "there is no error to aggregate." Since Slaughter has failed to show clear error on any of the issues raised, there is no cumulative error. As such, Slaughter cannot rely on cumulative error to reverse his convictions.

Affirmed.